THE STATE OF OHIO, APPELLEE, *v.* VAN HOOK, APPELLANT.

[Cite as State *v.* Van Hook (1988), 39 Ohio St. 3d 256.]

(No. 87-1159—Submitted June 14, 1988—Decided November 9, 1988.)

*Arthur M. Ney, Jr.,* prosecuting attorney, *Leonard Kirschner, William E. Breyer* and *Theodore J. Froncek,* for appellee.

*William Stewart Mathews II* and *Richard L. Bell,* for appellant.

HOLMES, J. Appellant asserts as his first proposition of law that the trial court failed to suppress the con-

fession given by appellant to Cincinnati homicide detective William Davis. The confession was made while appellant was in the custody of the Broward County Sheriff's office in Ft. Lauderdale, Florida, awaiting extradition to Cincinnati. Actually, the Ft. Lauderdale police had sought appellant for some time in their area. This was upon the recommendation of Detective Davis, who had received information through telephone calls from appellant's family.

On the morning of April 1, 1985, appellant was arrested by the combined forces of the Ft. Lauderdale and the Oakland Park Police Departments. While at the Oakland Park police headquarters, he was advised of his *Miranda* rights. At that time, he acknowledged that he wished to make a statement without an attorney present, but then added: "Maybe I should have an attorney." Interpreting this statement as an invocation of the right to counsel, police ceased all interrogation and informed the Cincinnati homicide department of the arrest. Appellant was then transferred to the Broward County Sheriff's Department. No attorney was provided to appellant between the time when police ended their interrogation and the time, some hours later, when appellant confessed to the Cincinnati homicide detectives.

At 9:20 p.m., the detectives arrived at the Broward County Sheriff's office, where they met with appellant. Initially, they discussed the extradition of appellant to Cincinnati. Apparently appellant had, subsequent to his post-arrest interrogation, voluntarily communicated to the Ft. Lauderdale police that he desired to waive the extradition process so as to expedite his return to Cincinnati. This had been communicated to the homicide detectives prior to their departure from Cincinnati. They sought to confirm these facts and also to inform appellant of their intention to leave for Cincinnati on the following day.

During the conversation, Detective Davis told appellant that he, Davis, had been in contact with appellant's mother and that "we had a lot to talk to him about." The detective informed him that the detectives could not talk to him unless appellant wanted to talk to them and make a statement. Appellant replied that he also had spoken with his mother, that she had advised him to "just tell the truth," and that he wanted to make a statement. Thereafter, police explained the *Miranda* rights to him, specifically asking if he now desired an attorney, to which he replied that he did not. Appellant then signed a Notification of Rights/Waiver of Rights form. Afterwards, a recording device was turned on and the police again explained to appellant all of his *Miranda* rights, pausing after each right to inquire whether appellant understood. They informed him that he could end the session at any time, after which they also inquired as follows:

"Q. Okay. And uh you do wanna make uh statement. Is that correct?

"A. Yes

"Q. An' I understand that you were arrested today at approximately what time?

"A. 10:50 this morning.

"Q. Okay, an' as you were being booked, you were given your rights by Sgt., I believe, Perry.

"A. Yes.

"Q. Okay, an' I also understand at that time you indicated to him that you wanted to make uh statement but that you wanted to confer with a lawyer first.

"A. Right.

"Q. Okay. But you have since changed your mind. Is that correct?

"A. Yes

"Q. Okay, an' this is being done of your own free will, correct?

"A. Yes sir.

"Q. Okay. Nobody's used any force, no coercion of any kind against you to make a statement?

"A. No

"Q. Can you explain why you changed your mind?

"A. Uh, I talked to my Mom today an' she jus' told me, you know, be cooperative an' jus' tell the truth.

"Q. An' that's when you, you, did you say you're waivin' your rights to an attorney at this time, after talkin' to your Mom[?]

"A. Right."

Appellant then made a full and graphic confession, which is attached hereinafter as the Appendix. The confession included an admission to the killing of David Self as well as to the robbery.

Appellant now asserts that the confession should have been suppressed in its entirety because it was the product of an interrogation which occurred *after* appellant requested to speak with an attorney and which thus violated the mandate set forth in *Edwards* v. *Arizona* (1981), 451 U.S. 477.

In *Edwards*, it was held that a suspect who has "expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, *unless the accused himself* initiates further communication, exchanges, or conversations with the police." *Id.* at 484-485. In subsequent cases, it has been determined that police may not reinitiate an interrogation under the guise of a "generalized discussion * * * [about] the investigation." *Oregon* v. *Bradshaw* (1983), 462 U.S. 1039, 1045. Also, in *Wyrick* v. *Fields* (1982), 459 U.S. 42, 46, it was held that interrogation may not resume "unless the sus-

pect himself initiates dialogue with the authorities." Most recently, these views were reaffirmed in *Arizona* v. *Roberson* (1988), 486 U.S. ____, 100 L. Ed. 2d 704, 108 S. Ct. 2093.

Having reviewed the record as well as the applicable case law, we conclude that the trial court did not err when it refused to suppress the confession at issue because the record demonstrates that appellant himself reinitiated his own interrogation through a third party. At the hearing on appellant's motion to suppress, Detective Davis was questioned about how he came to believe that appellant had changed his mind and now wished to make a statement without the benefit of counsel:

"Q. And immediately after Mr. VanHook indicated that to you did you provide him with the Miranda warning —

"A. Yes, sir.

"Q. — and the reason —. Had you had communications with Mr. VanHook's mother before going to Florida?

"A. Yes, sir.

"Q. And, had she indicated to you that she had talked to Mr. VanHook?

"A. She had.

"Q. And did she indicate to you anything that Mr. VanHook had told her?

"Mr. Mathews: To which I object.

"The Court: Objection will be sustained.

"Q. After speaking with Mrs. VanHook, did you think that Robert VanHook might want to talk to you?

"Mr. Mathews: To which I object.

"The Court: Overruled. You may answer that.

"A. Yes, I did.

"Q. And why was that?

"Mr. Mathews: To which I object.

"The Court: Just a moment. Objection overruled.

"A. She had told me —

"The Court: [Objection sustained.]."

Throughout the hearing, it was made clear that appellant had called his mother while he was in the custody of the Florida police. Detective Davis testified that thereafter he had been in communication with appellant's mother, and that this was prior to his flight to Ft. Lauderdale. It was Detective Davis's specific testimony that he conceived a belief that appellant would *want* to talk to him because of what "[s]he [appellant's mother] had told me —."

Although it is abundantly clear that the trial court erroneously excluded the content of appellant's statements to his mother, see Evid. R. 101(C)(3) and 104(A), we observe that such content is inferable from the record, specifically, that appellant had told his mother that he wanted to talk to Detective Davis. Concerning the initial part of Detective Davis's meeting with appellant, at which point no interrogation had occurred, but during which appellant stated that he would waive extradition, the detective testified as follows:

"We advised him that we had a lot to talk to him about. I advised him that *I had been in contact with his mother,* [and] * * * that we could not talk to him unless he wanted to talk to us and make a statement. He at that time replied that he had talked to his mother, and she had advised him to just tell the truth, and that he had, *that he did want to make a statement.*" (Emphasis added.)

This was reaffirmed in the taped conversation wherein appellant repudiated his earlier request for an attorney and stated that he had changed his mind earlier that day during a conversation with his mother.

As previously indicated, Detective Davis's belief that appellant would want to talk to him occurred after and because of what appellant's mother had said to him. In the context of this conversation, both appellant and Detective Davis predicated their conversation upon what had been spoken with appellant's mother. It is most clear that appellant had agreed to act upon his mother's advice "to tell the truth" and thus to "make a statement." Obviously, this was the subject of appellant's conversation with his mother, and he communicated his agreement to do so to her. That this had been communicated to Detective Davis is quite apparent from the context in which the detective utilized the fact of his conversation with appellant's mother, *i.e.,* as a basis for inquiring whether appellant indeed wished to make a statement. It would have had little meaning, particularly in light of appellant's response, unless both men understood that appellant's desire to make a voluntary statement had been communicated to Detective Davis through appellant's mother. Such communication constituted a reinstitution of conversation with police. A suspect who has ended interrogation by requesting the assistance of counsel may himself reinitiate the interrogation before counsel has been provided. *Edwards* v. *Arizona* (1981), 451 U.S. 477, and *Arizona* v. *Roberson* (1988), 486 U.S. ___, 100 L. Ed. 2d 704, 108 S. Ct. 2093. He may also reinitiate such interrogation through the agency of a non-attorney third party.

Our conclusion is further strengthened by the clarity with which appellant expressed his resolve to speak with police and his explanation that it was based upon discussions which he initiated with his mother. Furthermore, the decision to speak apparently had been reached earlier in the day, and thus well before he met with

Detective Davis. As such, the decision was made independently of anything police had said or done, and only after the most excruciating care had been taken to assure the voluntariness of appellant's statement. Moreover, the record reveals that appellant is both articulate and intelligent. See, *e.g.,* his unsworn statement made during the sentencing phase. Once an accused "knowingly and intelligently" elects to proceed without counsel, the uncounseled statements he then makes need not be excluded at trial. *Patterson* v. *Illinois* (1988), 487 U.S. ___, ___, 101 L. Ed. 2d 261, 271-272, 108 S. Ct. 2389, 2393-2394. Accordingly, we affirm the introduction of appellant's confession into evidence.

Appellant's second proposition of law challenges the admissibility of this confession on the ground that the corpus delicti of the aggravated murder was not established. Appellant argues that, where a defendant is charged with aggravated murder while committing, attempting to commit, or fleeing the commission or attempted commission of aggravated robbery, R.C. 2903.01(B), the state must separately prove the corpus delicti of the aggravated robbery as well as that of the homicide before a confession to both is admissible in its entirety. According to appellant, the court should have redacted the confession, leaving out those matters which were pertinent to the theft of the gold chains and a leather jacket.

The corpus delicti of a crime consists of two elements: the act and the criminal agency of the act. *State* v. *Maranda* (1916), 94 Ohio St. 364, 114 N.E. 1038. Before an out-of-court confession will be admitted, the corpus delicti must be established by evidence outside the confession. However, "[i]t is sufficient if there is *some* evidence outside of the confession that tends to prove *some* material element of the crime charged." (Emphasis *sic.*) *Maranda, supra,* at paragraph two of the syllabus. For example, when the offense is homicide, the corpus delicti "involves two elements, *i.e.,* (1) the fact of death and (2) the existence of the criminal agency of another as the cause of death." *State* v. *Manago* (1974), 38 Ohio St. 2d 223, 226-227, 67 O.O. 2d 291, 293, 313 N.E. 2d 10, 13.

The purpose of requiring the evidence of the corpus delicti as a foundation for admitting a confession was explained by the *Maranda* court: "The doctrine * * * was born out of great caution by the courts, in consideration of certain cases of homicide wherein it had turned out that by reason of the failure of the government to prove the death of the person charged as having been murdered it so happened that such person sometimes survived the person accused as his murderer." *Maranda, supra,* at 370, 114 N.E. at 1040. In light of the myriad procedural protections granted defendants in modern criminal practice, however, "the *corpus delicti* rule is supported by few practical or social policy considerations." This court has refused to apply it "with a dogmatic vengeance." *State* v. *Edwards* (1976), 49 Ohio St. 2d 31, 35-36, 30 O.O. 3d 18, 21, 358 N.E. 2d 1051, 1056.

With this view before us, we point out that we have ordinarily required separate proof of the corpus delicti of both the homicide and the robbery. *E.g., Edwards, supra,* at 35, 3 O.O. 3d at 20, 358 N.E. 2d at 1056; *State* v. *Black* (1978), 54 Ohio St. 2d 304, 308, 8 O.O. 3d 296, 297, 376 N.E. 2d 948, 951. We hasten to point out, however, that the standard of proof is not a demanding one. The prosecution need only adduce *"some* proof * * * *tending* to prove [the act and its agency]," but not necessarily such evidence as would rise

to the level of a prima facie case. (Emphasis added in part.) *Maranda, supra,* at 370-371, 114 N.E. at 1040. Also, as previously mentioned, Ohio does not require evidence upon all elements of the crime but only "*some* material element." *Maranda, supra,* at paragraph two of the syllabus.

Turning to the case before us, evidence that the victim was murdered is evidence that deadly force and a deadly weapon were utilized. Also, at trial, Stephen Wood testified that at about 9:00 a.m. on February 19, he noticed that the door to David Self's apartment was open. Wood went inside and found the victim's body. He testified that the victim's apartment was "neat most of the time," but that "things were * * * tossed around" the apartment. In support of this, the state adduced photographs taken of the apartment as it was discovered on the morning after the murder. State's exhibit 32 shows the desk in the victim's bedroom with its drawer missing. State's exhibit 33 shows the missing drawer lying face up on top of the air conditioner, and near the bed. State's exhibit 31 shows a dresser in the victim's bedroom. One drawer is open, as is the jewelry box on top of the dresser. State's exhibit 36 shows a small piece of jewelry located on the floor near the dresser. This evidence of the general disarrayed condition of the apartment, together with the specific fact that normally closed containers in which valuables were customarily kept were found open with the contents upon the floor, would indicate that a search was made of the premises, and that by the killer.

Finally, and of even greater significance, the bartender at the Subway Bar testified that the victim wore a gold chain around his neck when he left the bar with appellant on the night of his murder. The state conclusively demonstrated that the body as found did not have the chain upon it. This chain was never recovered. Its unexplained absence coupled with the circumstances of the murder strongly indicates that the gold chain was stolen.

Appellant asserts that someone other than appellant might have been responsible for the apartment's condition, since the door had been left open and at least one other person entered before police arrived. However, the identity of the criminal agent is not part of the corpus delicti, since the purpose is simply to establish that the crime occurred. See, *e.g., Groves* v. *State* (Ind. App. 1985), 479 N.E. 2d 626. Nor is it necessary to establish that the evidence exclude all other reasonable theories. *Black, supra.*

In conclusion on this point, there was considerable evidence that the victim had been robbed as well as murdered. Accordingly, there was sufficient evidence *dehors* the confession to firmly establish the corpus delicti predicate for its admission.

By his third proposition of law, appellant asserts that the trial court erroneously determined that the mitigating factor found in R.C. 2929.04(B)(3) did not exist. This statute states:

"Whether, at the time of committing the offense, the offender, because of a mental disease or defect, *lacked substantial capacity* to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law[.]" (Emphasis added.)

The trial court's conclusion, set forth in its sentencing opinion and relied upon by appellant, asserted the following:

"* * * [T]he defendant has *never* suffered from a mental disease or defect which would have prevented the defendant from distinguishing right from wrong or would have prevented him from conforming his conduct to

the requirements of the law. In other words the *defendant has never suffered from any psychosis*. Instead, he has been diagnosed over many years as having a borderline personality disorder which manifests itself in all types of antisocial behavior. This disorder is not a product of a mental illness or disease, so says the overwhelming weight of the professional testimony." (Emphasis added.)

Appellant's argument is premised upon the testimony of his psychiatrist, Dr. Emmett Cooper, who provided expert testimony during the sentencing phase. During the guilt phase, he asserted that appellant suffered from "a borderline personality disorder" characterized by impulsive behavior, self-damaging acts, substance abuse, unpredictable behavior, lack of control of anger, problems with self-control and gender identity, and mood swings. He stated further that the appellant had chronic feelings of impotence, loneliness, boredom, depression and irritability. It was the expert's conclusion that appellant experienced "an acute break with reality and acute psychosis" which interfered with his ability to perceive right from wrong.

Even a cursory glance at these alleged indications of "borderline personality disorder" demonstrates the reasonableness of the trial court's conclusions. Although the prosecution presented no evidence to rebut the expert's contentions, the psychiatric opinions offered during the guilt phase, which were fully available for consideration during the sentencing phase, overwhelmingly agreed that appellant was not suffering from any mental disease or defect. Further, the court concluded that appellant's claim of voluntary intoxication, and that it caused him to lose "touch with reality for some unspecified period of time while he mutilated the body of the victim," was nothing more than an attempt by appellant "to weave a story which might cause the three-judge panel to conclude that he was not in control of his faculties at the time he committed this heinous act." Dr. Cooper's testimony was based upon his assumption that appellant had indeed ingested alcohol and drugs just prior to the offense. In commenting specifically upon this testimony, the court refused to accept Dr. Cooper's theory of "the defendant's bizarre conduct." Having concluded that there was no "mental disease or defect" because of which appellant lacked the "substantial capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law," the court was fully justified in refusing to find the existence of a mitigating factor under R.C. 2929.04(B)(3).

Appellant also asserts under this same proposition of law that the standard to establish the above mitigating factor is identical to that required to find one not guilty by reason of insanity. Thus, once an insanity defense is disproved by the state in the guilt phase, a mitigating factor under R.C. 2929.04(B)(3) would be automatically precluded. We note that the mitigating factor as set forth above utilizes the term "substantial capacity" which is a term allowing a broader range of conditions than the term "capacity" standing alone. Of course, under either standard, it must be demonstrated that such lack of capacity resulted from a mental disease or defect. This appellant has failed to do.

Further, appellant argues that even if his mental state could not be characterized as a mental disease or defect, his condition should have been considered under R.C. 2929.04(B)(7)'s catchall provision for: "Any other factors that are relevant to the issue of whether the offender should be sen-

tenced to death." However, the trial court found as follows:

"It is true, that the defendant was afflicted with deficiencies of personality which suggested that he was destined to get into trouble. However, those same personality characteristics which allowed him to live and work within a community and society in a peaceful fashion when he chose to, compels [*sic*] this Court to a conclusion that the defendant functioned as a *rational human being* during the period of time surrounding the criminal activity of which he has been convicted." (Emphasis added.)

Accordingly, the trial court found, as we also do, that appellant's ability to distinguish right from wrong and/or to conform his conduct so as to abstain from the wrong was *not* impaired at all. There is therefore no need to consider the issue of such impairment under the catchall phrasing of R.C. 2929.04(B)(7).

Appellant, by his fourth proposition of law, asserts several arguments against the constitutionality of capital punishment and the Ohio statutes pertinent thereto. It is initially asserted that the multiple use of aggravated robbery to provide both the aggravating factor for aggravated murder and the specification rendering the offender eligible for the death penalty fails to constitutionally narrow the class of murderers to those deserving of the death penalty. Additionally, the same reasoning is applied to the use of the aggravated robbery charge during the sentencing phase of the trial. We have previously considered and rejected these arguments in *State* v. *Poindexter* (1988), 36 Ohio St. 3d 1, 3-4, 520 N.E. 2d 568, 571; *State* v. *Greer* (1988), 39 Ohio St. 3d 236, 530 N.E. 2d 382; *State* v. *Jenkins* (1984), 15 Ohio St. 3d 164, 177-178, 15 OBR 311, 322-323, 473 N.E. 2d 264,

279-280; *State* v. *Williams* (1986), 23 Ohio St. 3d 16, 23, 23 OBR 13, 20, 490 N.E. 2d 906, 914. Furthermore, the standards of appellate review set forth in the statute are fully sufficient to constitutionally guide appellate analyses in capital cases. *Proffitt* v. *Florida* (1976), 428 U.S. 242; *Jurek* v. *Texas* (1976), 428 U.S. 262.

Also, appellant challenges the provisions of Crim. R. 11(C)(3) which allow the trial court to dismiss the death penalty specification if the one so indicted pleads guilty and the "interests of justice" so require. It is asserted that the "interests of justice" standard is so vague as to be unconstitutional and also that it unfairly encourages pleas of guilty. We have already determined that the rule's standard provides sufficient guidance to the trial court's discretion. See, *e.g.*, *State* v. *Nabozny* (1978), 54 Ohio St. 2d 195, 200, 8 O.O. 3d 181, 183-184, 375 N.E. 2d 784, 789. Nor does Crim. R. 11(C)(3) improperly encourage guilty pleas. *State* v. *Steffen* (1987), 31 Ohio St. 3d 111, 125-126, 31 OBR 273, 286, 509 N.E. 2d 383, 396; *State* v. *Buell* (1986), 22 Ohio St. 3d 124, 138, 22 OBR 203, 215, 489 N.E. 2d 795, 808.

Appellant further argues under this proposition of law that the Ohio death penalty statute is unconstitutional for the following reasons: it does not allow the jury to grant mercy; it requires the jury to recommend death if aggravating circumstances even slightly outweigh the mitigating factors; it is not the least restrictive means of achieving permissible state interests; and the statute does not require the jury to explain its recommendation in writing, does not require the trial and appellate courts to apply the reasonable doubt standard to their independent review, and does not give guidelines for the proportionality review. These arguments have all been

previously considered and rejected by this court. *Steffen, supra,* at 125, 31 OBR at 285-286, 509 N.E. 2d at 396; *Jenkins, supra,* at 167-168 and 176-177, 15 OBR at 314 and 321-322, 473 N.E. 2d at 272 and 278-279; *State v. Zuern* (1987), 32 Ohio St. 3d 56, at 63-64, 512 N.E. 2d 585, at 592-593.

Appellant finally argues that the death penalty is disproportionately severe in this case because the county prosecutor has declined to seek it in other cases involving aggravated murder in the commission of aggravated robbery. "This issue was not raised at trial and [appellant's] allegations are therefore not supported by the record." *State v. Byrd* (1987), 32 Ohio St. 3d 79, 86, 512 N.E. 2d 611, 619. They are deemed waived. *State v. Greer, supra.* Moreover, we have upheld such exercise of prosecutorial discretion in prior cases. See *Greer, supra,* at 247, 530 N.E. 2d at 382.

We now independently evaluate whether the aggravating circumstances which characterized appellant's conviction outweighed that evidence set forth as mitigation during the sentencing phase. A review of the record discloses that none of the mitigating factors set forth in R.C. 2929.04(B)(1) through (6) is applicable. Appellant presented notable evidence to the effect that his mental condition was either diseased or defective and/or that the events resulted from ingestion of drugs and alcohol. In light of the record, we find such theories not to be credible. Although we are persuaded that appellant experienced considerable difficulty due to an emotionally unstable home life while growing up, many persons encounter such difficulties without turning to violent criminal conduct. Moreover, the evidence of the aggravating circumstances associated with this savage murder and robbery clearly overwhelms the scant evidence offered in mitigation.

We now consider whether the sentence imposed upon appellant in this case is disproportionate or excessive in comparison with the penalty imposed in cases with similar facts. This court has approved the death penalty in prior cases of aggravated murder involving an aggravated robbery. See, *e.g., State v. Post* (1987), 32 Ohio St. 3d 380, 395, 513 N.E. 2d 754, 768, and cases set forth in fn. 10; see, also, *Greer, supra.* We now conclude that the sentence of death is neither excessive nor disproportionate, but, in light of the facts of the case before us, is appropriate.

Accordingly, the judgment of the court of appeals is affirmed.

*Judgment affirmed.*

MOYER, C.J., SWEENEY, LOCHER and DOUGLAS, JJ., concur.

WRIGHT and H. BROWN, JJ., dissent.

WRIGHT, J., dissenting. Because I believe that appellant's inculpatory statement to Cincinnati homicide investigators at the Broward County, Florida, jail was the product of an unconstitutional interrogation, initiated by police after appellant had invoked his right to counsel, I must respectfully dissent.

I

The relevant facts in this case are as follows:

Florida police officers arrested appellant on the morning of April 1, 1985, and took him to the police station in Oakland Park, Florida. Appellant was advised of his rights, acknowledging his understanding of each right after it was read to him. Detective

Kenneth Perry of the Oakland Park Police Department asked appellant "if he wished to make a statement without an attorney present." Appellant agreed, then paused and said, "Maybe I should have an attorney." The Florida officers then stopped the interrogation.

Officer William Davis and Specialist Kerry Rowland of the Cincinnati Police Department arrived at the jail about 9:20 p.m. and asked that appellant be brought to an interview room. Appellant did not yet have counsel. When appellant entered the room, the officers identified themselves and told appellant that they were aware appellant was waiving extradition and that they were taking him back to Cincinnati.

Officer Davis then told appellant that he and Rowland "had a lot to talk to him about." Davis said that he had been in contact with appellant's mother. Davis told appellant that the officers could not talk to him unless he wanted to talk to them. According to Davis, appellant told the officers that he had spoken with his mother, who had advised him to tell the truth, and that he wanted to make a statement. Appellant then made a recorded statement in which he admitted killing and robbing David Self. Appellant's statement concerning the robbery is the only probative evidence of this aggravating circumstance.

The majority opinion and the state suggest that appellant told his mother to inform the Cincinnati police that appellant was ready to talk. THE RECORD DOES NOT SHOW THAT APPELLANT TOLD HIS MOTHER THIS AND THE TRIAL COURT MADE NO SUCH FINDING. In fact, at a hearing on a motion to suppress, this exchange took place:

"Q. Okay. And it's your testimony today that he [defendant] didn't call or *he didn't have anybody call you* and say to come to the jail when you arrived in Ft. Lauderdale, that he wanted to talk with you?

"A. [Officer Davis] That's correct." (Emphasis added).

Later in the hearing on cross-examination of Davis by the state, this exchange occurred:

"Q. And was it your testimony that when you approached Mr. VanHook you had indicated to him you were not going to interrogate him because he had previously requested a lawyer? Did you tell Mr. VanHook that?

"A. No, I did not.

"Q. How did that exactly happen then?

"A. I advised Mr. VanHook that we had a lot to talk about, and that we could not talk to him unless he himself wanted to make a statement. And he at that point indicated he had talked to his mother, and that she had told him just to tell the truth, and he wanted to make a statement.

"Q. And immediately after Mr. VanHook indicated that to you did you provide him with the Miranda warning —

"A. Yes, sir.

"Q. — and the reason —. Had you had communication with Mr. VanHook's mother before going to Florida?

"A. Yes, sir.

"Q. And, had she indicated to you that she had talked to Mr. VanHook?

"A. She had.

"Q. And did she indicate to you anything that Mr. VanHook had told her?

"MR. MATHEWS [Defense Counsel]: To which I object.

"THE COURT: Objection will be *sustained.*

"Q. After speaking with Mrs. VanHook, did you think that Robert VanHook might want to talk to you?

"MR. MATHEWS: To which I object.

"THE COURT: Overruled. you may answer that.

"A. Yes, I did.

"Q. And why was that?

"MR. MATHEWS: To which I object.

"THE COURT: Just a moment. Objection overruled.

"A. She had told me —

"THE COURT: Just a moment, sir.

"A. I'm sorry.

"THE COURT: My apologies. I *sustained* the objection rather than overruled [it]. Pardon me." (Emphasis added.)

For whatever reason, the court excluded the content of this conversation despite the fact that hearsay is admissible in a suppression hearing. Evid. R. 101(C)(1) and 104(A). Because the state made no proffer, whatever appellant's mother told Officer Davis is not in the record, and thus not before us.

From these facts, it is this court's duty to determine whether the interrogation by Cincinnati police was improper and whether the derivative confession should have been suppressed.

## II

The starting point of any analysis into custodial interrogation is *Edwards* v. *Arizona* (1981), 451 U.S. 477. In that case, the Supreme Court held at 484-485 that a suspect who has "expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police."

The prophylactic rule of the *Edwards* case came as a corollary to the rule stated in *Miranda* v. *Arizona* (1966), 384 U.S. 436, 474, that "[i]f the individual states that he wants an attorney, the interrogation must cease until an attorney is present." In such an instance, the Supreme Court has concluded that "[i]f the interrogation continues without the presence of an attorney and a statement is taken, *a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel.*" (Emphasis added.) *Id.* at 475.

In *Edwards,* the Supreme Court held that "it is inconsistent with *Miranda* and its progeny for the authorities, at their instance, to reinterrogate an accused in custody if he has clearly asserted his right to counsel." *Edwards, supra,* at 485. The court concluded that reinterrogation may only occur if "the accused himself initiates further communication, exchanges, or conversations with the police." *Id.*

The significance of the invocation of the right to counsel is premised in part on a lawyer's "unique ability to protect the Fifth Amendment rights of a client undergoing custodial interrogation." *Fare* v. *Michael C.* (1979), 442 U.S. 707, 719. As Justice White accurately stated in his concurrence in *Michigan* v. *Mosley* (1975), 423 U.S. 96, 110, fn. 2:

"[T]he reasons to keep the lines of communication between the authorities and the accused open when the accused has chosen to make his own decisions are not present when he indicates instead that he wishes legal advice with respect thereto. The authorities may then communicate with him through an attorney. More to the point, the accused having expressed his own view that he is not competent to deal with the authorities without legal advice, a later decision at the authorities' insistence to make a state-

ment without counsel's presence may properly be viewed with skepticism."

### III

It is undisputed that appellant invoked his right to counsel in the case at bar. Thus, the only issues in dispute are whether appellant (a) initiated further discussions with the police, and (b) knowingly and intelligently waived the right he had invoked. *Edwards, supra,* at 485, 486, fn. 9; *Smith* v. *Illinois* (1984), 469 U.S. 91, 98. For the reasons set forth below, I believe it is obvious that the state has failed to prove that appellant initiated further discussions with police. Indeed, the record requires a contrary finding. Therefore, the court of appeals' affirmance of the death penalty in this case is faulty and must be reversed.

### A

Despite the inadequate record in this case, the appellate court believed that appellant had told his mother to tell police that he was ready to talk. This belief is borne out in the court's statement that "since the Cincinnati police had information that * * * [appellant] now wanted to talk, they were also entitled to determine whether that information was correct."

Although there seems to be no reason why a defendant in custody could not initiate contact with the police through a third party, the record simply does not reflect that appellant did so. Indeed, Officer Davis testified that neither the defendant nor anyone else called him to say that the defendant wanted to initiate further discussions. Therefore, Davis' statement that he and appellant "had a lot to talk about" initiated a "generalized discussion about the investigation" with appellant. *Oregon* v. *Bradshaw* (1983), 462 U.S. 1039, 1045-1046.

In *Wyrick* v. *Fields* (1982), 459 U.S. 42, 46, the Supreme Court ex-

plained the *Edwards* rule as holding that a suspect in custody cannot be subjected to further interrogation after he requests an attorney "unless the suspect himself initiates dialogue with the authorities." There is not a scintilla of evidence in the record to show that the appellant initiated further discussion. The court justifies its holding by drawing one inference from another. It infers that the appellant initiated further discussion from the inference about what appellant's mother supposedly stated to Officer Davis. This is guesswork about facts which are not in the record. Such inference building undermines the constitutional foundations upon which *Bradshaw, Fields* and *Edwards, supra,* are built.

As stated above, a "heavy burden" rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel. In *Bradshaw, supra,* at 1044, the plurality opinion stated:

"But even if a conversation taking place after the accused has 'expressed his desire to deal with the police only through counsel,' is initiated by the accused, where reinterrogation follows, the burden remains upon the prosecution to show that subsequent events indicated a waiver of the Fifth Amendment right to have counsel present during the interrogation."

To establish a waiver, it would be a *"necessary fact* that the accused, not the police, reopened the dialogue with the authorities." (Emphasis added.) *Edwards, supra,* at 486, fn. 9. As the court in *Arizona* v. *Roberson* (1988), 486 U.S. ___, 100 L. Ed. 2d 704, 108 S. Ct. 2093, recently pointed out, if a suspect believes that he is not capable of undergoing custodial interrogation without the advice of counsel, "then it is presumed that any subsequent waiver that has come at the authori-

ties' behest, and not at the suspect's own instigation, is itself the product of 'inherently compelling pressures' and not the purely voluntary choice of the suspect." *Id.* at ___, 100 L. Ed. 2d at 713, 108 S. Ct. at 2097-2098.

I think it is obvious that the state has failed to meet the burden of proof required under *Edwards* and its progeny and has otherwise failed to rebut the presumption that the waiver was the product of "inherently compelling pressures." Therefore, appellant's confession should have been suppressed.

### B

The court of appeals based its decision to affirm in part on the fact that *Edwards* is factually distinguishable from the instant case because the police officers who interrogated appellant the second time came from a different department than those who conducted the initial interrogation. The court below stated:

"In *Edwards,* officers of the *same* department initiated a compulsive [*sic*] discussion about the offense, after the prisoner said he did not want to talk to them. He was told he had to do so. In the instant case, the second conversation with the prisoner was begun by an entirely separate police department. Cincinnati police officers came to the place of custody for the purpose of taking Van Hook back to Cincinnati to face the charges of murder. This was their first contact with him. * * *" (Emphasis *sic.*)

In *Arizona* v. *Roberson, supra,* at ___, 100 L. Ed. 2d at 717, 108 S. Ct. at 2101, the Supreme Court specifically rejected this distinction:

"* * * [W]e attach no significance to the fact that the officer who conducted the second interrogation did not know that respondent had made a request for counsel.* In addition to the fact that Edwards focuses on the state of mind of

the suspect and not of the police, custodial interrogation must be conducted pursuant to established procedures, and those procedures in turn must enable an officer who proposes to initiate an interrogation to determine whether the suspect has previously requested counsel. * * * [W]hether the same or different law enforcement authorities are involved in the second investigation, the same need to determine whether the suspect has requested counsel exists. The police department's failure to honor that request cannot be justified by the lack of diligence of a particular officer." (Emphasis added and footnote omitted.)

### C

The court of appeals also based its affirmance in part on the premise that the *Edwards* rule is not a "who said what first" *per se* rule. The appellate court applied a balancing test to determine whether the interrogation was impermissible: "The right of a person in custody to be free of impermissible compulsion or deception must be weighed against the need for reasonably efficient and aggressive law enforcement." Such a test is clearly erroneous in light of the clear, bright-line rule emphasized by the Supreme Court in *Edwards* and its progeny. See *Michigan* v. *Jackson* (1986), 475 U.S. 625, 634; *Smith* v. *Illinois, supra; Solem* v. *Stumes* (1984), 465 U.S. 638, 646; see, also, *Shea* v. *Louisiana* (1985), 470 U.S. 51; *Oregon* v. *Bradshaw, supra,* at 1044.

In *Fare, supra,* the Supreme Court explained that the "relatively rigid requirement that interrogation must cease upon the accused's request for an attorney * * * has the virtue of informing the police and prosecutors with specificity as to what they may do in conducting custodial interrogation, and of informing courts under what circumstances statements obtained

during such interrogation are not admissible." *Id.* at 718. Recently, the court stated in *Roberson, supra,* at ____, 100 L. Ed. 2d at 714, 108 S. Ct. at 2098: "Surely there is nothing ambiguous about the requirement that after a person in custody has expressed his desire to deal with police through counsel, he 'is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication * * *.' [*Edwards, supra,*] 451 U.S., at 484-485 * * *." See, also, *Bradshaw, supra,* at 1044-1045.

If the above language and the aforementioned cases do not demonstrate that *Edwards* established a *per se* rule, *i.e.,* that police may not initiate a conversation on the subject of an investigation after the accused requests counsel, I do not know what does.

The appellate court erroneously relied on *Bradshaw, supra,* to support its conclusion. In *Bradshaw,* a five-to-four majority of the Supreme Court reversed a state court decision which had held that the accused did not "initiate" a conversation with police. In that case, after asking for an attorney, the accused, without provocation, asked police officers, "Well, what is going to happen to me now?" A plurality of the Supreme Court found that this was sufficient to constitute an "initiation" by the accused under *Edwards.* The four dissenting justices would require the initiation by the accused to be *"about the subject matter of the criminal investigation."* (Emphasis sic.) *Bradshaw, supra,* at 1053. In the instant case, however, no probative evidence was ever offered to show that the accused initiated the interrogation. Without any evidence of such initiation, Davis' statement to appellant that the officers "had a lot to talk to

him about" initiated a conversation on the subject of an investigation and led to an impermissible interrogation under *Edwards.*

IV

Therefore, for the foregoing reasons, I would reverse the court of appeals and remand the cause to the trial court for a new trial.

H. BROWN, J., concurs in the foregoing dissenting opinion.

Appendix

"Homicide of David Self
(February, 1985)

"STATEMENT OF
ROBERT VAN HOOK

"Code to persons speaking in statement:
"Q.  Police Officer Bill Davis, Cincinnati Police Homicide Squad
"QQ.  Specialist Kerry Rowland, Cincinnati Police Homicide Squad
"A.  Robert Van Hook

"Q.  This is Police Officer William Davis an' Specialist Kerry Rowland of the Cincinnati Homicide Unit. Today's date is 4-1-85, the time is 9:55 P.M. We're here at the Broward County Jail, uh that's in Ft. Lauderdale, Florida an' the following will be a taped statement from Robert Van Hooks [*sic*], Jr., whose date of birth is 1-14-60, is that correct, Bob?
"A.  Yes
"Q.  An' this statement will be in regards to the homicide of one David Self, which took place on the night of 2-18-85. Before we go into this, Bob, I in front of, I have in front of me uh Division of Police Notification of Rights form. These rights were read to you out loud an' you read 'em along with me, is that correct?

"A. Yes

"Q. An' jus' for the record, I'm gonna go over 'em for ya, okay. Before we ask you any questions you must understand your rights. You understand that?

"A. Yes sir.

"Q. You have the right to remain silent. You understand that?

"A. Yes

"Q. Anything you say can be used against you in court. Do you understand that?

"A. Yes

"Q. You have the right to talk to uh lawyer for advice before we ask you any questions an' to have him with you during questioning.

"A. Yes

"Q. You cannot afford a lawyer one will be appointed for you before any questioning if you wish. You understand that?

"A. Yes

"Q. If you decide to answer questions now without a lawyer present you'll still have the right to stop answerin' at anytime. You also have the right to stop answering at anytime until you talk to uh lawyer. You understand that?

"A. Yes

"Q. An' this bottom part is uh Waiver of Rights. I have read this statement of my rights. I understand what my rights are. I am willing to make a statement and answer questions. I do not want a lawyer at this time but understand and know what I'm doing. No promises or threats have been made to me and no pressure or coercion, which means force, of any kind have [sic] been used against me. You understand that?

"A. Yes

"Q. Okay, I have on the bottom here a signatures [sic] of Robert Van Hook signed 9:38. Uh is this your signature?

"A. Right.

"Q. Okay. And uh you do wanna make uh statement. Is that correct?

"A. Yes

"Q. An' I understand that you were arrested today at approximately what time?

"A. 10:50 this morning.

"Q. Okay, an' as you were being booked, you were given your rights by Sgt., I believe, Perry

"A. Yes

"Q. Okay, an' I also understand at that time you indicated to him that you wanted to make uh statement but that you wanted to confer with a lawyer first.

"A. Right.

"Q. Okay. But you have since changed your mind. Is that correct?

"A. Yes

"Q. Okay, an' this is being done of your own free will, correct?

"A. Yes sir.

"Q. Okay. Nobody's used any force, no coercion of any kind against you to make a statement?

"A. No

"Q. Can you explain why you changed your mind?

"A. Uh, I talked to my Mom today an' she jus' told me, you know, be cooperative an' jus' tell the truth.

"Q. An' that's when you, you, did you say you're waivin' your rights to an attorney at this time, after talkin' to your Mom[?]

"A. Right.

"Q. Okay. Why don't you tell Detective Kerry, Kerry Rowland an' myself what happened. Would you start from the beginning of that day, like when you got up. An' we're talkin' about the day of February the 18th of '85. Is that correct?

"A. Uh huh, yes

"QQ. It was on Presiden'ts [sic] Day, that'll help ya remember, you know

"A.   Yeah

"QQ.   more people were off work, the businesses were closed.

"A.   Uh I don' remember everything that happened that day, matter-of-fact, I don't remember most of what happened that day except what I had in mind that night an' that was to go down into the Subway, uh homosexual bar in downtown Cincinnati, an' my objective was to lure a homosexual uh to whatever place I could with intentions to rob the person an' so we uh, I met this guy an' I lured 'im on

"Q.   Where'd you meet him at?

"A.   At the Subway an' I lured 'im on an' uh as if I were gonna have, you know, sex with 'im an' he went, I took 'im in my car to uh his apartment where I uh, we entered the apartment an' I went over an' had uh seat in his living room an' turned on the stereo an' he started undressing an' he came over to me an' I had my penis out an' he leaned down to, suck my penis an' then, then I grabbed him in uh strangle hold I learned when I was in the service, anyway, throwed 'im down until he stopped breathing an' then I don' know what come over me

"Q.   Where'd it take place at, uh, Bob?

"A.   This is in his apartment.

"Q.   You recall what room?

"A.   This is in the living room.

"Q.   Is that where the TV's at or where the couch is at?

"A.   It was by the stereo

"Q.   Okay

"A.   An'

"Q.   You say you held 'im down?

"A.   Yeah, until he stopped breathing. I don' know if I broke his neck or not but that's what I was tryin' to do, an' I don' know why, something, I don' know it's like somethin' possessed me, I jus' wanted to try all these techniques of killin' somebody that I learned in the service an' TV an' so

forth an' jus' went berserk. An' I went into the kitchen, I left him lying on the floor an' I looked for uh knife. I found uh paring knife. I went back into the living room an' I stabbed 'im behind the ear lobe. It's uh passage into the brain an' I uh, it's called the scramblin', scrambler technique.

"Q.   An' you learned that in the service?

"A.   Yes, an', an', uh, I stuck the knife in the back of his head an' I started twistin' it. Then I tried to stab 'im in the neck an' I tried to cut his head off but it didn't, it wasn't working too well. I jus' wanted to see more blood, you know, cut his stomach open. I was tryin' to work my way through his stomach an' into the heart. I wanted to, wanted to see what it, what he looked like with blood squirtin' out of it an' uh I proceeded to cut his stomach open, well that was after I cut his stomach open. Then I threw the knife in his stomach when I cut it an', I — an' I got frightened an' I went into the bedroom after I searched him an' couldn't find any money, it's then I uh wen' an' got in the jewelry box an' pulled out some gold chains. Then I took his leather jacket an' went to the door but it was locked from the inside, I couldn' get it open an' I started gettin' paranoid so I went into the kitchen an' found uh butter knife, somethin' I opened it, opened the door an' I shut it an' before I left the apartment I made sure the stereo was playin' an' uh I got in my car an', I was scared an' I had blood all over my shirt an' I went to uh friend's house

"Q.   Who, whose uh house did you go to?

"A.   Uh Doctor uh Robert Hoy an' uh I told 'im that I had got in uh fight with my stepfather that's why I had the blood all over my shirt.

"Q.   Where does Dr. Hoy live at?

"A. He lives in uh — I think Ft. Thomas in uh retirement center.

"Q. Okay, you told 'im you had uh fight with your father?

"A. I told 'im I got in uh fight with my father an' that

"Q. —

"A. that's why I had the blood all over my shirt an' he gave me some money. I told him I had to get out of town. He gave me thirty dollars an' fed me an' I left. I drove all night an' part of the next day an' I stopped fifty miles north of Chattanooga. I ran out of gas an' I didn' have no more money for gas so I abandoned my car on the highway an' I

"Q. This is, what highway was that, huh?

"A. 75, so

"Q. Jus' left the car on the highway?

"A. On the side of the emergency lane an' I left the leather jacket in it that was his an' I took the bloody shirt off that I had on. I looked back in the car an' I had another shirt in the back I put on. I started hitch hiking. I got down here the next day an' I wen' straight to the gay bar I use to hustle at when I was uh teenage an' then I uh, I met this one guy an' he took me home an' let me stay with him for about uh week an' then I got uh job an' then uh the people I was riding to work with I uh ended up staying with them, but they weren't you know, they weren't homosexual or anything, they were straight. An' I, I worked until the person that I was driving to work with his car broke down an' then I, about the las' two weeks I been goin' down to the main strip an' bout once uh week I'd go down there an' lure uh homosexual to the room an' uh, I'd, an' I didn' try an' kill nobody down here but I uh assulted [sic] uh couple guys, took their money.

"Q. In the last couple weeks? Did, have you hurt anybody down here?

"A. No, no I haven't hurt nobody.

"Q. Okay. Well let's go back, okay, to Cincinnati on the 18th when you left home an' your intentions were to go to the Subway an' to roll a homosexual?

"A. Lure uh, yeah, roll uh homosexual.

"Q. Uh huh, have you done this before in Cincinnati that is?

"A. No, I never rolled nobody before in my life

"Q. Okay, did you approach the victim or did the victim approach you in the bar?

"A. I was sittin' next to 'im an' he started conversing an' uh he started talkin' an' I was tellin' 'im how, you know, I was expensive an' that if he didn' have no money he couldn't have no sex an' he

"Q. Uh huh, did he proposition you or did you proposition him? Or did he, did it even occur that way?

"A. No, then I jus' told 'im I was expensive an' that, you now, I was lookin' for somebody to take care of me but that I had expensive tastes an' he would have to have uh lot of money.

"Q. What did he say?

"A. I don'; I don' know, I can't quite remember. But anyway we uh ended up goin' to his place an' I had in mind that I was jus' gonna knock 'im out an' take his money but

"Q. So you got to the place, the first thing you did, you say he sat down on this chair an' he was in the process of changin' his clothes?

"A. He was in the process of taking his clothes off.

"Q. Takin' 'im off. Okay, you, you had your penis out?

"A. yeah

"Q. Did you take it out or did he take it out?

"A. Uhh, I took it out

"Q. Uh huh, an' was this, was this to lure him over to you?

"A. Yes

"Q. Okay, then once over to you he started to go down on you an' that's when you grabbed him in the uh head-lock?

"A. Yes

"Q. An' you think you broke his neck?

"A. That's what I tried to do.

"Q. Okay, an' did you, di' you punch 'im or slap 'im or anything?

"A. No, I jus', you know he bent down I jus' grabbed 'im real fast an' twisted his neck an' I

"Q. Threw 'im, threw 'im to the floor?

"A. I throwed 'im on the floor until he stopped breathin' an' then I don' know what came over me.

"QQ. You said he'd first turned the stereo up loud or somethin'?

"A. It wasn't loud, I jus', he [sic] was already on he turned it on it was one of the first things he did when he was in the apartment.

"Q. Then did you, after he was, was he unconscious then or was he dead, do you believe when you uh

"A. He,

"Q. went to get uh knife?

"A. he was unconscious. He was kind uh like makin' this weird like (makes choking sound) sound.

"Q. Uh huh. Where's the first place you cut 'im at ?

"A. I believe the ear in the brain.

"Q. An' this was that scrambling technique that you learned? An' how'd you learn this?

"A. When I was goin' through hand to hand combat training an' uh knife attack an' defense techniques.

"Q. Special Forces?

"A. They were, I was trained by Special Forces Specialists

"Q. An' where did this take place at?

"A. In Butcher's Garden [sic] in Germany

"Q. That was when

"A. '78, '79

"Q. Okay, you said that wasn't working, is that correct?

"A. What, scrambler?

"Q. Usin' scrambler technique.

"A. Wasn't working?

"Q. Yeah, you said, you said it, it didn't work?

"A. It must of worked (laughs) when

"Q. But you said you went back to get another knife

"A. No, after I, after he was unconscious I went into the kitchen an' I looked for uh knife an' I think I found uh knife. I uh scrambled his brain an' I started, I was stabbin' his neck an' I was tryin' to cut his head off but it wasn't cuttin' very good so I went back in the kitchen an' looked for uh knife, another knife an' I couldn't find one so I jus' kept usin' the paring knife.

"Q. Now, okay, that's where I was confused. Okay.

"A. So I went back out an' I started cuttin' 'im some more.

"QQ. Where was this now that you were cutting him more, in the stomach?

"A. I think I, yeah, I guess when I uh I cut his stomach open an' I pushed my hand an' knife up into the, I was trying' to poke the heart, stab the heart cause I wanted to see the blood squirtin' from the heart all over the place.

"Q. But then you s [sic], then you said you went into the bedroom to the jewelry box?

"A. Yeah, after I threw the knife. I put the knife down in his stomach, I

"Q. Did you search 'im for any money before you did that, before you went to the jewelry box?

"A. I searched 'im for money right after I had 'im down, after I

"Q.  Uh huh did you

"A.  choked 'im.

"Q.  find any money?

"A.  No, I think that's what might uh been what made me go berserk (laughs) you know.

"Q.  But what all did you take out of the jewelry box?

"A.  He had some gold chains an' some —

"QQ.  How many gold chains did you take?

"A.  I don' know, s [sic], there's uh bunch of 'em all wadded up together.

"Q.  What did you do with 'em?

"A.  Well, I uh, took the leather jacket he had an' the jewelry an' I went to the door an' it was locked from the inside an' I couldn't get out so I took uh butter knife an' I uh opened the door from the inside an' I, the next day I jus', an' well when I ran out of gas. I didn', I was scared an' I didn' wanna get pulled over hitch hikin' an' had that stuff on me so I threw it away.

"QQ.  Threw everything away then?

"A.  Jus' the jewelry. I left the leather jacket, it was too little for me an' I left it in my car.

"Q.  Okay, an' that car's, was abandoned about fifty miles north of Chattanooga on 75?

"A.  Yes

"Q.  Okay then you came down here an' you met up with uh few people an' this is where you've been since.

"A.  Yeah

"Q.  Okay. Uh,

"QQ.  How come you stuck the knife back in his stomach was it any special reason?

"A.  Well I figured all the blood that was there cover up any fingerprints that I left on the knife an' I went back in the kitchen where I'd seen I left fingerprints looking for the second knife an' I kind uh smeared 'im an' I went in the refrigerator an' I's tryin'

to find somethin' to eat but I didn' see nothin' I liked, so I shut the door.

"QQ.  Well you jus', did you wipe your fingerprints off the refrigerator or anything?

"A.  All's I know is I, I seen where I left fingermarks in the blood so I jus' kind uh smeared it

"QQ.  So nobody'd know, you know it was your fingerprints?

"A.  Yeah

"Q.  When you left the apartment did you see anybody?

"A.  I seen one guy but he didn't seem to be payin' any attention to me —

"Q.  Well, where'd that take place at?

"A.  Where'd what?

"Q.  Where did you see this guy at?

"A.  Down in the, by the garage area where they keep the cars in the parking area.

"Q.  Okay. Is there anything else you'd like to say before we turn this recorded [sic] off?

"A.  I can jus' say you know, I don't know what even possessed me to, to do somethin' like that, you know, even on drugs an' alcohol I usually, I can maintain my senses pretty well.

"Q.  Okay, then, I'd like to re-iterate the fact that this statement's been given of your own free will. Is that correct?

"A.  Yes

"Q.  Nobody's pressured you into giving this statement?

"A.  No

"Q.  Okay, uh an' you do under-stand your constitutional rights.

"A.  Yes sir

"Q.  Okay. Well this will conclude this statement given by one Robert Van Hooks [sic]. The end.

"Transcribed by Gale Ravenscraft
"Criminal Investigation Section
"April 4, 1985"