The STATE of Ohio, Appellee,

v.

SMITH, Appellant.

[Cite as *State v. Smith* (1996), 115 Ohio App.3d 419.]

Court of Appeals of Ohio,
Third District, Auglaize County.

No. 2-95-20.

Decided Nov. 20, 1996.

*Garrett T. Gall,* Auglaize County Prosecuting Attorney, and *Amy Otley Fox,* Assistant Prosecuting Attorney, for appellant.

*David H. Bodiker,* Ohio Public Defender, *David Hanson* and *Joseph A. Licavoli,* Assistant Public Defenders, for appellant.

---

SHAW, Judge.

This is an appeal by the defendant-appellant, Gregory Smith, from the judgment of the Court of Common Pleas of Auglaize County, entered on a jury verdict of guilty to the charge of murder, pursuant to R.C. 2903.02(A). Defendant was sentenced to fifteen years to life in prison and fined $15,000 plus costs.

On July 9, 1992, Ashton Smith, the eleven-week-old son of defendant and Heather Smith, was found dead in his infant swing. Ashton's death was

originally ruled by the coroner to be the result of Sudden Infant Death Syndrome ("S.I.D.S.") However, in August 1994, police obtained letters written by defendant to his wife in which he admitted smothering their son. During a police interrogation, defendant made a full confession, which he later recanted. Defendant was charged with murder and pled not guilty. A trial was held in May 1995, wherein defendant claimed that he had lied about killing Ashton in order to hinder a malpractice lawsuit filed against Ashton's doctors by defendant's wife. The jury found defendant guilty of murder, in violation of R.C. 2903.02(A). Defendant appeals this verdict, asserting the following two assignments of error:

## FIRST ASSIGNMENT OF ERROR

"Appellant was deprived of his right to a fair trial as guaranteed by the Ohio and United States Constitutions when other acts evidence and bad character evidence was introduced in contravention of Evid.R. 403 and 404 and R.C. 2945.59, thereby violating appellant's right to a fair trial."

## SECOND ASSIGNMENT OF ERROR

"Appellant was deprived of his right to the effective assistance of trial counsel as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution, and Article [I], Section 10 of the Ohio Constitution, by trial counsel's numerous serious errors occurring throughout the course of the case, beginning in the pretrial preparation and culminating in the actual conduct of the trial."

Defendant and Heather Smith were married in early 1992, while Heather was pregnant with Ashton. Ashton was the biological child of Heather Smith and Andrea Sharp. Defendant and Heather Smith are both Caucasian, while Ashton's natural father, Andrea, is African–American. Defendant was aware of these facts before he married Heather, but chose to marry Heather and raise Ashton as his own son.

Soon after he was born, Ashton experienced medical problems including periods of apnea and projectile vomiting. On one occasion, approximately a month before his death, Ashton stopped breathing and was rushed to the hospital, where he was placed on an apnea monitor and underwent surgery to correct the projectile vomiting. The apnea monitor tracked Ashton's breathing and heart rate and would sound an alarm if the rates went below a certain level. During the week Ashton spent in the hospital, Heather Smith and defendant both testified that the apnea monitor went off several times in their presence. Heather stated that on two occasions the monitor sounded and Ashton did not appear to be breathing. During this time, Heather testified that she physically stimulated Ashton to breathe.

By July 8, 1992, Ashton had been released from the hospital but was still being treated for vomiting. At approximately 9:00 p.m. that evening, Heather fed

Ashton as usual and placed him in his infant swing. She had been told by Ashton's doctor to keep him upright after feeding to help reduce vomiting. Ashton fell asleep in the swing and remained there through the night. Heather went to bed around 11:30 p.m. From 11:30 p.m. until approximately 1:45 a.m., when defendant joined Heather in their bedroom, defendant was alone in the living room with Ashton. Around 9:00 a.m. the next morning, defendant went to feed Ashton and found him lifeless in the swing. Ashton was later pronounced dead at the scene.

Following Ashton's death, an autopsy was performed by Dr. Lee Lehman from Montgomery County. Auglaize County Coroner Dr. Thomas Freytag testified that he initially ruled Ashton's death to be consistent with S.I.D.S. This was based on Freytag's initial observations that there was no evidence that Ashton's death was caused by anything other than S.I.D.S.

In July 1994, new information surfaced concerning the circumstances surrounding Ashton's death. Shortly after Ashton's death, defendant was imprisoned on unemployment compensation fraud charges which are unrelated to this case. While in prison in July 1994, defendant confessed to his cellmate that he had smothered his son to death. Defendant's cellmate notified prison authorities about defendant's confession. Subsequently, a warrant was obtained for handwritten letters which defendant had written to his wife in which he similarly confessed to suffocating Ashton to death. After being interrogated about these letters and the circumstances surrounding Ashton's death by police, defendant confessed a third time to killing Ashton by suffocation.

As a result of defendant's multiple confessions and information provided by police, Freytag testified that he changed Ashton's death certificate to reflect that Ashton's death was caused by "death by suffocation, homicide" and not by S.I.D.S. as he had concluded earlier. Defendant was thereafter indicted and eventually convicted of murder.

In defendant's first assignment of error, he claims that he was deprived of a fair trial due to the admission of highly prejudicial character and "other acts" evidence concerning his homosexuality, his prior domestic abuse of his wife and his alleged use of racist remarks while in prison. The record contains handwritten letters from defendant to his wife that were written while defendant was in prison for unemployment compensation fraud. In these letters, defendant admitted to smothering Ashton to death and to being a homosexual. Defendant also apologized to his wife for threatening to kill her on one occasion and for hitting her on other occasions. In defendant's oral confession to police, he admitted to calling a fellow prison inmate "colored" and then apologizing for it.

It is axiomatic that the admission and exclusion of evidence rests within the sound discretion of the trial court and such decisions will not reversed on appeal absent an abuse of discretion. *State v. Sage* (1987), 31 Ohio St.3d 173, 31 OBR 375, 510 N.E.2d 343. Moreover, evidence of other acts is admissible if (1) substantial proof shows that the defendant committed the alleged other acts, and (2) the evidence tends to prove motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. *State v. Lowe* (1994), 69 Ohio St.3d 527, 634 N.E.2d 616; see, also, Evid.R. 404(B); R.C. 2945.59. The other acts need not be similar to the crime charged, but they must tend to show one of the factors listed in Evid.R. 404(B) and R.C. 2945.59. *State v. Shedrick* (1991), 61 Ohio St.3d 331, 337, 574 N.E.2d 1065, 1069–1070. The rule and statute codify an exception to the common law; accordingly, they are construed against admissibility of the "other acts" evidence. *State v. Broom* (1988), 40 Ohio St.3d 277, 533 N.E.2d 682, paragraph one of the syllabus.

Upon review of the record, we find that the trial court did not abuse its discretion in admitting the aforementioned character and bad acts evidence. During his trial, defendant claimed that his confession regarding Ashton's murder was simply a story he had made up to persuade Heather to dismiss the medical malpractice case she had filed against one of Ashton's physicians. In our view, such evidence was relevant in providing the full context of defendant's written confession to the jury so that the jury had the opportunity to assess the credibility of his claim that he lied about killing Ashton. Moreover, the full context of the confession provides evidence of defendant's motive in murdering Ashton, as defendant wrote that he killed Ashton because of the problems he and Heather were experiencing in their relationship as well as defendant's difficulty in coping with raising a biracial child.

With respect to defendant's oral comments whereby he referred to his cellmate as "colored," we similarly find that the trial court acted within its discretion in playing the audiotape of defendant's oral confession in its entirety. In any event, we find that in light of defendant's multiple confessions as well as other evidence adduced at trial, there is no reasonable probability that the admission of this statement contributed to defendant's conviction. Thus, even assuming *arguendo* that this statement was admitted in error, such error was harmless. *State v. Moritz* (1980), 63 Ohio St.2d 150, 17 O.O.3d 92, 407 N.E.2d 1268.

Based on the foregoing, we find no error on the part of the trial court in admitting defendant's oral and written confessions in their entirety. We further find that defendant has not demonstrated that the admission of these confessions

resulted in material prejudice or an unfair trial.[1]  Accordingly, defendant's first assignment of error is overruled.

In defendant's second assignment of error, he argues that he was deprived of the effective assistance of counsel because of his attorney's failure to request funds to hire an expert as well as request a psychiatric examination.  Defendant further argues that his attorney was ineffective for failing to move to exclude other-acts and bad-character evidence and failing to object to alleged inflammatory statements made by the prosecuting attorney.

The standard for appellate review of a claim of ineffective assistance of counsel in Ohio as stated in *State v. Hamblin* (1988), 37 Ohio St.3d 153, 155–156, 524 N.E.2d 476, 478–480, is as follows:

---

1.  In this regard, the dissenting opinion herein misconstrues the record and the applicable law in claiming that there was no evidence as to the cause of death outside the confessions to establish a criminal agency.  The reality is that the medical testimony established that the baby's death was equally consistent with having been smothered in the manner admitted by defendant or with unexplained death often referred to as Sudden Infant Death Syndrome.  As such, the medical evidence as to cause of death is equally susceptible of inferences of innocence as well as inferences of guilty.  While this might have caused a problem under the former "equal inference" rule of *State v. Kulig* (1974), 37 Ohio St.2d 157, 66 O.O.2d 351, 309 N.E.2d 897, the Supreme Court of Ohio specifically overruled the *Kulig* decision in *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492.  Under *Jenks*, the jury is expressly permitted to make a proper inference of guilt or innocence in this situation.  *Id.* syllabus.

It is also important to recognize that the record contains evidence of three separate confessions by the defendant under entirely different circumstances;  one in a letter which the defendant had written to his wife, another in verbal form to a cellmate in prison and a third in a formal taped interview with police officers.  Regarding the latter confession, in addition to the testimony of a police officer, the jury also heard the actual audio tape of the entire interview in which the confession took place.  As a result, the jury had the opportunity to evaluate the defendant's voice and demeanor as he first repeatedly denied the act and then, in an emotional manner, admitted on some nine separate occasions during the interview that he had pinched the baby's nose shut and covered his mouth in order to suffocate him.  Finally, the jury also had the opportunity to evaluate the direct testimony of Kirk Sessler, the defendant's cellmate, who testified that following a church session, the defendant had been in a remorseful state of mind and verbally admitted to him that he had smothered the child and needed to tell his wife;  hence, the subsequent letter.

However, in addition to the letter, the tape and the testimony of his cellmate, the jury also had the opportunity to evaluate and consider the defendant's own testimony at trial.  Of specific interest is that the defendant denied making any admission to Sessler, thus placing before the jury a direct credibility question as between the defendant and Sessler.  Moreover, the defendant's effort to offer an exculpatory explanation for the letter and the police interview from the witness stand gave the jury further opportunity to evaluate the defendant's credibility, not just in comparison with Sessler and the police officers who took his statement, but also in comparison to the defendant's own voice and demeanor as reflected in the audiotape of his confession.

In short, we believe that the varied circumstances and corroborative aspects of these admissions, together with the medical testimony establishing the time of death of the infant at a time when the defendant was alone with the infant, clearly overcome the traditional concerns of unreliability underlying the original *corpus delicti* rule and place this case squarely within the parameters of proper jury consideration under *State v. Jenks, supra.*

"In Ohio, a properly licensed attorney is presumed competent. *Vaughn v. Maxwell* (1965), 2 Ohio St.2d 299, 301, 31 O.O.2d 567, 568, 209 N.E.2d 164, 166. The appellant bears the burden of proving that his trial counsel was ineffective. To carry this burden, appellant must show that counsel made errors so serious that counsel failed to function as the 'counsel' guaranteed by the Sixth Amendment. *Strickland v. Washington* (1984), 466 U.S. 668, 687 [104 S.Ct. 2052, 2064, 80 L.Ed.2d 674, 693]. Appellant must also demonstrate that the deficient performance prejudiced his defense. To establish prejudice, appellant must show that there is a reasonable probability that but for counsel's mistakes, the result of the trial would have been different. *Strickland, supra.*"

With respect to defendant's contention regarding his counsel's failure to request funds to hire a medical expert to testify in connection with the cause of Ashton's death, it is well established that counsel's decisions concerning which witnesses to call at trial fall within the realm of trial strategy and tactics and generally will not constitute ineffective assistance of counsel. *State v. Clayton* (1980), 62 Ohio St.2d 45, 49, 16 O.O.3d 35, 37–38, 402 N.E.2d 1189, 1192; *State v. Hunt* (1984), 20 Ohio App.3d 310, 20 OBR 411, 486 N.E.2d 108. In our view, in light of the evidence presented at trial, defendant has not established that there is a reasonable probability that the outcome of his trial would have been different if his attorney had called a medical expert on his behalf. Thus, we find that defendant has failed to establish that he received ineffective assistance of counsel in this regard.

As to counsel's alleged ineffectiveness in not requesting a psychiatric evaluation, nothing in the record indicates that counsel was deficient in not doing so. The record reveals that defendant's testimony was very clear with respect to dates, times, and events. There is no indication that appellant was unable to assist in his defense or that he was unable to understand the nature of the proceedings against him. Moreover, the record indicates that the trial court conducted a competency hearing pursuant to R.C. 2945.37 in response to defendant's motion to discharge his trial counsel. At that hearing, the trial court personally addressed the defendant and determined that he was competent to stand trial. Thus, as there is no indication that a psychiatric evaluation was warranted, we find that defense counsel was not ineffective in failing to request such an evaluation.

Defendant next argues that his counsel was ineffective for failing to move the trial court to exclude other-acts and bad-character evidence contained in several of the state's trial exhibits. In light of our determination set forth in defendant's first assignment of error that this evidence was relevant and thus admissible, trial counsel's failure to move to exclude such evidence did not constitute ineffective assistance of counsel.

Finally, defendant takes issue with his attorney's conduct during closing argument. Specifically, defendant claims that his attorney failed to object when the prosecuting attorney said, "Do not think for a minute that a man who murdered an eleven-week-old infant because he was jealous and embarrassed wouldn't hesitate to come into this courtroom and lie to your faces." Defendant further argues that his attorney should have objected when the prosecutor commented in her rebuttal to closing argument that defendant's wife Heather still had one year to file the medical malpractice claim which had been previously filed and dismissed. In our view, none of the prosecuting attorney's comments during closing argument deprived defendant of a fair trial. Thus, defendant has failed to establish that his counsel was ineffective by virtue of his alleged errors or omissions during closing argument. Defendant's second assignment of error is overruled.

Based on the foregoing, defendant's two assignments of error are overruled and the judgment of conviction and sentence of the Auglaize County Court of Common Pleas is hereby affirmed.

*Judgment affirmed.*

HADLEY, P.J., concurs separately.

EVANS, J., dissents.

HADLEY, Presiding Judge, concurring separately.

I concur in the analysis and disposition of the majority opinion and write separately only to address the issue of the *corpus delicti* rule raised in the dissent.

As pointed out by the dissent, the *corpus delicti* rule has ancient origins and the Supreme Court of Ohio has expressed doubt about the practicality of the rule today in light of the other safeguards afforded to defendants. *State v. Edwards* (1976), 49 Ohio St.2d 31, 36, 3 O.O.3d 18, 21, 358 N.E.2d 1051, 1056–1057.

The rule was invoked to prevent the government from introducing confessions to prove deaths that ultimately were found not to have actually occurred. While the state must prove all the elements of the crime beyond a reasonable doubt, including those relating to the *corpus delicti*, the evidence required to be produced before a confession is admissible is not proof beyond a reasonable doubt or even enough to make up a prima facie case. *State v. Maranda* (1916), 94 Ohio St. 364, 114 N.E. 1038.

Where proof of the death is direct and positive, if the circumstances taken together show that there is reasonable grounds to believe that the death was other than by natural means, then an extrajudicial confession can be used to

establish the perpetrator's connection with the death. Additionally, if the facts corroborate the confession by showing that there is some evidence outside the confession that tends to prove some material elements of the crime, then the purpose of the *corpus delicti* rule has been accomplished and full, direct, and positive evidence of the *corpus delicti* is not indispensable to admit the confession into evidence without a showing of proof as to the manner and means by which the perpetrator accomplished the killing. *State v. Knapp* (1904), 70 Ohio St. 380, 71 N.E. 705.

In the case *sub judice*, the coroner, Dr. Thomas Freytag, testified as to the death of the infant as occurring between midnight and 2:00 a.m., a time when only the appellant had access to the child. After receiving the report from the Montgomery County Coroner's Office which conducted the autopsy, while Freytag concluded at that time (as did the Montgomery County Coroner) that the cause of death was undetermined and sometimes referred to as sudden infant death syndrome ("S.I.D.S."), he noted that it was not exclusively consistent with that cause. He testified that S.I.D.S. and suffocation due to homicide both indicate death from lack of breathing, but having no apparent trauma or other evidence to the contrary at the time, the "medical data was inconclusive." Thus, he ruled that it was S.I.D.S. He further stated that "it becomes an investigative procedure that makes the differentiation" between S.I.D.S. and suffocation due to homicide. Upon receipt of the additional investigative information in this matter, he subsequently came to his conclusion of death by suffocation due to homicide and altered the death certificate accordingly.

The Montgomery County Deputy Coroner, Dr. Lee Lehman, who conducted the autopsy, also testified that the autopsy was consistent with suffocation due to homicide and that the circumstances of a criminal investigation are sometimes required to make conclusions in an autopsy.

The record having thus revealed " '*some* proof * * * *tending* to prove [the act and its agency],' but not necessarily such evidence as would rise to the level of a prima facie case," the *corpus delicti* requirement has still been satisfied and the extrajudicial confession can be admitted. (Emphasis added in part.) *State v. Van Hook* (1988), 39 Ohio St.3d 256, 261–262, 530 N.E.2d 883, 888–889, quoting *Maranda, supra,* 94 Ohio St. at 370–371, 114 N.E. at 1039–1040.

Evans, Judge, dissenting.

Although appellant did not object to the introduction of his confessions at trial or assert any error in regard to the use of his confessions to this court, I am, nonetheless, convinced that errors in law have occurred with respect to the *corpus delicti* rule that substantially affected the rights of the defendant in this

case and constitute plain error. As a result, I am compelled to dissent from the opinion of my colleagues.

Plain errors or defects, as stated in Crim.R. 52(B), "affecting substantial rights may be noticed although they were not brought to the attention of the court." "Notice of plain error under Crim.R. 52(B) is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *State v. Long* (1978), 53 Ohio St.2d 91, 7 O.O.3d 178, 372 N.E.2d 804, paragraph three of the syllabus. I believe the instant case poses an exceptional circumstance that demands application of the plain error rule. In the interests of justice, and after significant consideration, I would reverse appellant's conviction and order his sentence vacated.

The admission of appellant's confessions prior to the prosecution's establishment of the *corpus delicti* of a crime constitutes plain error in this case. The case of *State v. Maranda* (1916), 94 Ohio St. 364, 114 N.E. 1038, long ago articulated the rule in Ohio requiring proof of the *corpus delicti* before admission of a confession. The syllabus in *Maranda* states:

"1. By the *corpus delicti* of a crime is meant the body or substance of the crime, included in which are usually two elements: 1. The act. 2. The criminal agency of the act.

"2. It has long been established as a general rule in Ohio that there must be some evidence outside of a confession, tending to establish the *corpus delicti*, before such confession is admissible. The *quantum* or weight of such outside or extraneous evidence is not of itself to be equal to proof beyond a reasonable doubt, nor even enough to make it a *prima facie* case. It is sufficient if there is *some* evidence outside of the confession that tends to prove *some* material element of the crime charged."

The *corpus delicti* rule has ancient origins. It was born out of caution, aimed at preventing those cases "wherein it had turned out that by reason of a failure of the government to prove the death of the person charged as having been murdered it so happened that such person sometimes survived the person accused as his murderer." *Id.*, 94 Ohio St. at 370, 114 N.E. at 1040. However, given the modern procedural safeguards now available to criminal defendants, even the Supreme Court has expressed doubt about the practicality of the rule today and has refused to apply the rule with "dogmatic vengeance." *State v. Edwards* (1976), 49 Ohio St.2d 31, 36, 3 O.O.3d 18, 21, 358 N.E.2d 1051, 1056–1057. Rather, proof of *corpus delicti* has been interpreted to be a minimal standard, requiring only "some" proof by the prosecution that a crime has been committed. Though the rule has undergone some criticism, even those courts that have questioned its practicality have not ignored its application. *State v. Ralston* (1979), 67 Ohio App.2d 81, 21 O.O.3d 403, 425 N.E.2d 916 (suggesting

more lenient avenues of compliance utilized by other jurisdictions).[2] Nor can I, in the present case, turn a blind eye to the longstanding principle that was so obviously overlooked at the trial level.

The Supreme Court of Ohio in *Edwards,* 49 Ohio St.2d 31, 3 O.O.3d 18, 358 N.E.2d 1051, has reaffirmed the principles set forth in *Maranda.* Therefore, when a defendant is charged with murder, the *corpus delicti* "involves two elements, *i.e.,* (1) the fact of death and (2) the existence of the criminal agency of another as the cause of death." *State v. Manago* (1974), 38 Ohio St.2d 223, 226–227, 67 O.O.2d 291, 292–293, 313 N.E.2d 10, 12–14. The burden of proving the material facts relating to the *corpus delicti* is on the prosecution. *Id.* at 226, 67 O.O.2d at 292–293, 313 N.E.2d at 12–13. However, this burden is not a demanding one. "The prosecution need only adduce '*some* proof * * * *tending* to prove [the act and its agency],' but not necessarily such evidence as would rise to the level of a prima facie case. (Emphasis added in part.)" *State v. Van Hook* (1988), 39 Ohio St.3d 256, 261–262, 530 N.E.2d 883, 888–889, quoting *Maranda,* 94 Ohio St. at 370–371, 114 N.E. at 1039–1040.

A review of the record in this case clearly demonstrates that appellant was convicted solely by his own words, both written and spoken. It was his confession to his cellmate, his confession to his wife, and his confession to the police that formed the core of the prosecution's case. However, before *these confessions* may be considered admissible, there must be *some* evidence that a crime had been committed or that *some* criminal agency had been at work. Herein lies the error in appellant's trial. *Corpus delicti* evidence did not exist in this case. While there is evidence of a death, there is no evidence outside the confessions to demonstrate a criminal agency at work.

Prior to appellant's confessions, made nearly two years after Ashton had died, the police did not suspect Ashton's death was a homicide. The police officers in this case stated they did not believe nor was there evidence to show that Ashton had been abused or injured. Furthermore, the coroner and pathologist testified

---

2. In *Ralston,* hunters found the unconcealed, scattered remains of a woman identified as Nancy Grigsby in November 1976. Grigsby was twenty-two years old and in good health when she disappeared nearly six months earlier in May 1976. The county coroner who examined Grigsby's remains testified that nothing indicated a cause of death nor could he conclude the death was the result of a criminal act. Larry Ralston later confessed to police that he drove Grigsby to a lonely spot in the country, strangled her, and deposited her body in the precise location where it was found. Ralston's confession was admitted at his trial; however, on appeal, the Twelfth District reversed the judgment and discharged the defendant. Although the appeals court found that Ralston possessed knowledge of details of the crime privy only to the police and Grigsby's murderer and that his confession was corroborated by the evidence, the court reluctantly adhered to the principle set out in *Maranda* that the confession was not admissible until *after* establishment of the *corpus delicti.* Since no *corpus delicti* was established, Ralston's confession was wrongfully admitted at trial.

that their results indicated only that Ashton had stopped breathing, which, without more, was ruled a natural death and not a homicide. Dr. Lehman, the pathologist who autopsied Ashton, testified in this case that nothing can distinguish between a S.I.D.S. death and intentional suffocation.

The concurring opinion issued by this court finds the *corpus delicti* rule satisfied by the medical testimony in this case. The concurrence points to the ambiguous and inconclusive nature of the medical testimony and seems to find some evidence of a criminal act in the inability of medical experts to rule out homicide. This position ignores two important facts. First, based on the initial investigation which contained no indication of foul play, medical experts did essentially rule out the possibility of homicide, declaring Ashton's death a death by natural causes or S.I.D.S. The medical testimony indicated that the child died from lack of breathing, which by itself, has no criminal implication. Second, the subsequent "criminal investigation," which was used to justify altering the death certificate to homicide, was based on the confessions of appellant. To use appellant's confessions as justification to characterize Ashton's death as a homicide and then, in turn, to use that characterization as "some evidence" tending to prove a criminal act to justify admitting appellant's confession at trial is circuitous.

The court in *Ralston* recognized the flaw in this reasoning stating:

"One might argue that if the independent evidence is sufficient to corroborate the confession it must be 'some evidence' tending to prove that the death was the result of a criminal act. The fallacy in this argument is that the independent evidence in this case, for the reasons set out in the body of the decision, is ambiguous; and, the ambiguity is only resolved by the confession. 'Dead body found in lonely place' is only significant when the defendant says, 'I killed her and put the body in that place.'" *Ralston*, 67 Ohio App.2d at 85, 21 O.O.3d at 405, 425 N.E.2d at 919, fn. 2.

Clearly, without the confessions, there is nothing in the record on which to base even a suspicion of a homicide in this case.

The burden of demonstrating the *corpus delicti* is initially placed on the prosecution as a prerequisite to the admissibility of the confessions.[3] As the facts

---

**3.** Contrary to the conclusion reached in the majority opinion, *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, does not displace the *corpus delicti* rule, since *Jenks* is not dispositive of the admissibility problem at issue in this case. Whether evidence of a confession meets the *corpus delicti* rule and is therefore admissible at trial is a preliminary issue separate in substance and in time from the legal issues considered in *Jenks*. *Jenks* addresses the legal sufficiency of evidence necessary to obtain and uphold a verdict. Thus, *Jenks* speaks only to the propriety of drawing certain inferences from the evidence of record *after* that evidence has been properly admitted at trial.

of this case show, the prosecution could not and did not present any evidence to meet this minimal requirement. Since the *corpus delicti* was not established, the confessions used by the prosecution were not admissible in court. Without the confessions, no crime was proven in this case. Therefore, I would dismiss the charge against the appellant and order the appellant discharged.