OPINION
Defendant-Appellant Mark R. Gilliam appeals his convictions for rape with a weapons specification, kidnapping with a weapons specification, and possession of cocaine, asserting four assignments of error. First, he claims the trial court erred by failing to sustain his Crim.R. 29 motion for acquittal at the close of the State's case in chief. Next, Gilliam contends the trial court should have instructed the jury on the "affirmative defense" of consent. Third, he claims his trial counsel's representation was so deficient as to constitute ineffective assistance of counsel. Finally, Gilliam argues his convictions were both unsupported by sufficient evidence and against the manifest weight of the evidence. For the reasons that follow, however, we affirm Gilliam's convictions.
 According to Shelly Weigand, the victim in this case, on the evening of June 3, 1998, she invited her friend James Davis (hereinafter "J.D.") to her apartment to watch a basketball game on television. J.D. indicated he would be bringing another person with him, and, when he arrived at Weigand's apartment, Gilliam was with him. J.D. and Weigand periodically snorted lines of cocaine J.D. had brought with him as they watched the basketball game. In addition, all three drank beer and smoked a marijuana cigarette which Gilliam had provided. At some point in the evening, Weigand's roommate, Erin Noel, and her boyfriend Sean arrived at the apartment; they went to bed approximately twenty to thirty minutes later. Weigand mentioned to J.D. and Gilliam the possibility that she might do a favor for them if they did one for her, meaning she would let J.D. use her car if he and Gilliam would pay for cable television to be connected to her apartment. Later, not wanting to disturb Noel and Sean with the music they were listening to, Gilliam, Weigand, and J.D. decided to go to Gilliam's apartment to continue their activities. Gilliam took his car back to his apartment, and J.D. and Weigand followed in her car.
At approximately 2:00 a.m., they arrived at Gilliam's apartment. All three drank more beer, and J.D. and Weigand consumed more cocaine. Some time later, J.D. received a message on his pager, and explained that he had to go "make a run," meaning he had to go sell some cocaine. He asked Weigand if she would loan him her car, which she did. She testified that at that point, she had no reason to distrust Gilliam, and did not feel concerned about being in his apartment without a way home because she knew J.D. would be back in approximately twenty minutes. Before he left, Weigand asked J.D. for another line of cocaine, but Gilliam told her not to worry because he had some cocaine for her.
After J.D. left, however, Weigand testified that Gilliam began pressuring her for sex. As he had promised, he provided her with another line of cocaine. Because she was beginning to feel uncomfortable, Weigand went to the bathroom to get away from Gilliam, but she later returned to the living room where Gilliam continued to make advances. Weigand recalled that in addition to moving from place to place in the living room as a way of avoiding Gilliam, she made two phone calls, one of which was to her own apartment, but that she was unable to reach anyone at either number. She snorted another line of Gilliam's cocaine using her driver's license to prepare the drug, and a rolled up dollar bill to inhale it. When Gilliam asked her how she planned to pay for the cocaine, she said she would pay him the next day, but Gilliam suggested she pay with sex. She refused. When Gilliam turned off the living room light, Weigand testified that she became "petrified," turned the light back on, and asked if she could page J.D. from Gilliam's phone. Gilliam told her he would page J.D., and did. According to Weigand, when J.D. called back, she told him Gilliam was giving her a hard time, and asked him when he would be returning to which he replied that he would be back in another twenty minutes.
After talking to J.D., Weigand tried to watch television again. When Gilliam turned the light off again, she told him she wanted to leave. Gilliam was undeterred, however, and told her she was not leaving. It was during this time that Gilliam pulled down his pants and asked Weigand to kiss his penis. She refused and attempted to leave, but Gilliam grabbed her and pulled her back into the apartment. Weigand testified that when she turned around, she could see that he had a gun with a silver barrel pointed at her. Gilliam directed her to the bedroom, where, she testified, he forced her to disrobe and remove a tampon from her vagina, then vaginally raped her, holding the gun to her head the whole time.
Weigand stated that during the rape, she heard a knock at Gilliam's door, and believed it to be J.D. returning. Shortly thereafter, Gilliam got up off of her whereupon she hastily got dressed and fled from the apartment. She testified that she did not know where Gilliam had gone, and that she was only concerned with getting away from him, even forgetting to take her driver's license with her when she left the apartment. Weigand stated she was not familiar with the area, and that shortly after leaving the apartment, she hid under a shrub because she was afraid to be out in the open as she thought Gilliam might be following her.
At 3:45 a.m., according to his clock, Franklin Tate was awakened by his dog, who needed to go outside for reasons that need no explanation. Upon escorting his pet outside, Tate spotted Weigand cowering under a shrub on his property. She asked for help, told him she had been raped by a man named Mark who had a gun, gave Tate a physical description of Gilliam, and cautioned him to be careful because Mark might be following her. Tate testified that Weigand was shaking or rocking, appeared very nervous and frightened, and "freaked out" when a car drove up the driveway of the business next door to him. He did detect the smell of alcohol on Weigand's breath, but stated she appeared to be in control of her faculties, and was neither stumbling nor slurring her speech.
Unwilling to let a stranger into his home under such circumstances, Tate retrieved his telephone from inside and allowed Weigand to use it from his deck. Weigand testified that she called a friend, told him what happened, and asked him to come pick her up, but that he didn't because she was not familiar enough with the area to tell him her location. After the phone call, Weigand asked Tate for directions to Woodman Avenue, where her apartment was located, and he pointed her in the appropriate direction. Although Tate offered to call a taxi for her, she refused and left.
Weigand testified that she called her roommate Noel from a pay phone outside of a convenience store. Approximately twenty minutes later, Noel picked Weigand up in her car. Noel testified that Weigand was hysterical in the car, and was incapable of speaking at first. Bit by bit, the story came out, however, and Noel insisted that Weigand go to the police. After stopping for cigarettes and soft drinks, and spending approximately five minutes at Weigand's friend Josh's house, they proceeded to the police station. At about 6:30 a.m., Officer William Wallace of the Dayton Police Department escorted the women to Miami Valley Hospital where Weigand was examined. Officer Wallace testified that Weigand was very upset, but was able to tell him what had happened. Because Weigand had called her apartment from Gilliam's phone, his name, phone number, and time of the call, 3:42 a.m., were stored on Wiegand's caller ID unit. That information was retrieved, a cross-check was made to obtain Gilliam's address, and Officer Wallace and two other officers proceeded to Gilliam's apartment and arrested Gilliam for rape.
At trial, Gilliam testified in his own defense; he was the only defense witness. His testimony differed from Weigand's in one significant respect, although there were other minor discrepancies as well. In particular, Gilliam did not deny engaging in sexual intercourse with Weigand, but claimed it was consensual. According to Gilliam, early in the evening, J.D. led him to believe that Weigand would trade sex for drugs. Gilliam also testified that Weigand made just such an offer when she mentioned she would do them a favor if they would do one for her. He denied pulling Weigand back into his apartment and pointing a gun at her, but admitted that throughout the night, a black handgun was in plain view on a table in his apartment. Gilliam testified that after J.D. left his apartment, and Weigand refused to perform oral sex, he and Weigand went to his bedroom where he donned a condom and the two had consensual sex for approximately fifteen or twenty seconds at which point they were interrupted by a knock at the apartment door. According to Gilliam, he and Weigand then got up and got dressed, and Weigand walked out of the apartment without a word, leaving her driver's license behind. Gilliam followed her outside in an attempt to return her license to her, but did not see her on the street. He then returned to his apartment and fell asleep. The next thing he knew, the police were knocking on his door, and he was arrested for raping Weigand.
Later that day, Gilliam consented to a search of his apartment. Detective William Lawson of the Dayton Police Department testified that he and the other police personnel involved in the search recovered Weigand's driver's license, the dollar bill Weigand used to inhale the cocaine, two handguns, one with a silver barrel and the other solid black, two small bags of marijuana, and a bag containing 12.03 grams of cocaine from Gilliam's apartment.
On June 11, 1998, Gilliam was indicted on one count of rape with a firearm specification, and one count of kidnapping, also with a firearm specification. A second indictment which added one count of possession of cocaine was filed on August 18, 1998, and the earlier indictment was subsequently nolled. Gilliam's defense counsel moved for acquittal both orally at the close of the State's case, and in writing after the jury verdicts finding Gilliam guilty of all charges were returned. Both motions were denied by the trial court. On October 13, 1998, Gilliam was sentenced to ten years of confinement on the rape offense and ten years on the kidnapping offense, to be served concurrently. In addition, Gilliam was ordered to serve a three year term of incarceration on the firearm specifications, which were merged, and eighteen months on the possession of cocaine offense, both to be served consecutively. Gilliam's timely appeal followed. We turn our attention now to his four assigned errors.
 I. The trial court erred in failing to sustain Mr. Gilliam's Rule 29 motion for acquittal at the end of the State's case.
Crim.R. 29(A) permits a court, at the close of either party's evidence and on a defendant's motion or sua sponte, to order entry of a judgment of acquittal of an offense charged when the evidence is insufficient to sustain a conviction for the offense. At the close of the State's case, Gilliam's defense counsel made an oral motion for acquittal, which was denied. In his first assignment of error, Gilliam claims the trial court's denial of his motion was error.
Under Crim.R. 29, a trial court "shall not order an entry of judgment of acquittal if the evidence is such that reasonable minds can reach different conclusions as to whether each material element of a crime has been proved beyond a reasonable doubt." State v. Bridgeman (1978), 55 Ohio St.2d 261, syllabus. Furthermore, a trial court must view the evidence in a light most favorable to the State when considering a motion for acquittal. State v. Evans (1992), 63 Ohio St.3d 231, 248. Thus, "the test an appellate court must apply when reviewing a challenge based on a denial of a motion for acquittal is the same as in reviewing a challenge based upon the sufficiency of the evidence to support a conviction." State v. Thompson (Apr. 23, 1998), Cuyahoga App. No. 72044, unreported. In performing such review, therefore, the appellate court's function is to "examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of defendant's guilt beyond a reasonable doubt." State v. Jenks (1991), 61 Ohio St.3d 259, paragraph two of the syllabus. The relevant inquiry is whether any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt, keeping in mind that the evidence is viewed most favorably to the prosecution. Id. If so, then denial of a defendant's Crim.R. 29 motion is proper. See Bridgeman, supra, syllabus. Thus, we proceed.
Gilliam first argues that the State failed to prove he violated R.C. § 2925.11(A) by knowingly obtaining, possessing, or using a controlled substance. Gilliam directs us to certain portions of the transcript in which Weigand stated that J.D. was the only person that provided her with cocaine that night, that Gilliam was not using cocaine, and that when she wanted cocaine, she asked J.D., not Gilliam, to give her some. These statements of Weigand's, however, were all made in the context of the activities at her apartment earlier in the evening. Tr. at 129-30. In her testimony, she also stated that after she, Gilliam, and J.D. went to Gilliam's apartment, she asked J.D. to leave some cocaine for her to use while he was gone on his "run." Tr. at 137. Gilliam told her not to worry, that he had "a whole bunch of cocaine" in the apartment. Id. After J.D. left, Gilliam retrieved the cocaine and laid it on the table, and Weigand testified that she eventually snorted three lines of cocaine provided by Gilliam. Tr. at 137-39. Furthermore, Weigand stated that Gilliam asked her how she was going to pay for the cocaine he had provided to her that night.
In addition to Weigand's testimony, the State's witness Detective William A. Lawson of the Dayton Police Department testified that he recovered a bag containing a white powdery substance believed to be cocaine from the chest of drawers in Gilliam's bedroom. Tr. at 318-19. The substance was later tested and proved to be cocaine. Tr. at 339. Finally, Gilliam and the State stipulated to the fact that if called to testify, Gary Shaffer, a forensic chemist for the Miami Valley Forensic Crime Lab would testify that the substance seized at Gilliam's apartment was tested and found to be cocaine, and that it had a net weight of 12.03 grams. Tr. at 350-51.
Viewing the evidence in a light most favorable to the State, we find that reasonable minds could conclude from the foregoing evidence that Gilliam knew the substance to be cocaine, that he knew it was in his apartment, and that he exercised dominion and control over it by retrieving it, offering it for use, and attempting to arrange payment for the portion used, and that the element of scienter was thereby satisfied beyond a reasonable doubt. Consequently, the trial court did not err in denying Gilliam's motion for acquittal as to the possession of cocaine count.
Next, Gilliam contends it was error for the trial court to deny his Crim.R. 29 motion as to the rape and kidnapping counts. R.C. § 2907.02(A)(2) makes it a crime to engage in sexual conduct with another when the offender purposely compels the other person to submit by force or threat of force. The offense of kidnapping is committed when a person, by force, threat, or deception, removes another from the place where the other person is found, or restrains the liberty of the other person, for the purpose of engaging in sexual activity with the victim against the victim's will. R.C. § 2905.01(A)(4). Gilliam claims the State's evidence was insufficient to prove beyond a reasonable doubt that he committed the crimes of rape and kidnapping.
In support of his claim, he relies on the parties' stipulation that if called to testify, Annette Davis, forensic scientist for the Miami Valley Regional Crime Lab would testify that no semen or spermatozoa were found in any of the various swabs and samples taken from Weigand during her examination at the hospital. The parties also stipulated, however, that Davis would also testify that in cases where vaginal intercourse has occurred and a condom was used or the woman is menstruating, it is not unusual that semen or spermatozoa is not found. In addition, although Weigand stated she did not see Gilliam put a condom on, she did testify that she had just started menstruating that day, and that her flow was quite heavy. Thus, a reasonable person could conclude that the results of the hospital tests were negative for sperm and spermatozoa due to Weigand's menstruation.
Gilliam also claims that the State's evidence precluded Gilliam's conviction on the rape and kidnapping counts because, if believed, Weigand's efforts to avoid Gilliam, his request that she kiss his penis, her attempt to leave, Gilliam's dragging her back into the apartment at gunpoint, the rape itself, Weigand's subsequent escape, and her positioning herself under Tate's shrub would have all had to have happened in three minutes. This is so, Gilliam argues, because Weigand's caller ID unit indicated the call Weigand made to her apartment from Gilliam's phone was placed at 3:42 a.m., and Tate testified that he woke to take his dog outside at 3:45 a.m. Gilliam contends neither the rape nor the kidnapping could have occurred in three minutes, and that his motion for acquittal on those counts consequently should have been granted.
At trial, the accuracy of Weigand's caller ID unit's time stamp was addressed. Officer Wallace testified that the accuracy of the unit was never verified. Tr. at 293. On cross-examination by Gilliam's defense counsel, Officer Greg Gaby, the Dayton police officer who retrieved Gilliam's name and phone number and the time of Weigand's call from the caller ID unit, testified only that the time stamp was "fairly accurate," it was "in the right time frame," and that it may have been off by a couple of minutes or so. Tr. at 309. Officer Gaby also testified, however, that he had no idea how many calls were recorded on the caller ID unit for the morning in question, and that he went through them looking only for Gilliam's name. Tr. at 308. In addition, he stated that he could not say whether Gilliam's name appeared more than once on the caller ID unit. There was no testimony regarding the accuracy or inaccuracy of Tate's clock.
Seizing upon the inconsistency between the testimony describing the events of the evening and that respecting the time frame in which those events were supposed to have happened, Gilliam argues that Weigand's story cannot possibly be believed. Gilliam, like the appellant in State v. Goff (1998), 82 Ohio St.3d 123,139, however, "fails to recognize that in a review of the sufficiency of the evidence, the court does not engage in a determination of the witnesses' credibility." That task is reserved for the trier of fact. State v. DeHass (1967), 10 Ohio St.2d 230, paragraph one of the syllabus. Moreover, the resolution of inconsistent testimony is also a function of the factfinder. State v. Grinnell (1996), 112 Ohio App.3d 124, 147.
The question for us, therefore, is not whether the testimony concerning the time frame of the events was more credible than the testimony regarding the events themselves. Instead, we view all of the evidence in a light most favorable to the prosecution, and determine whether a reasonable mind could conclude that the offenses charged had been proven beyond a reasonable doubt. In doing so in the present case, it is our view that reasonable minds could conclude that one or both of the devices relied on to pinpoint the time of the rape were incorrectly set, and that it was beyond reasonable doubt that Gilliam committed the offenses of rape and kidnapping. Consequently, we find no error in the trial court's denial of Gilliam's oral motion for acquittal made at the close of the State's case in chief. His first assignment of error, is accordingly overruled.
 II. The trial court erred in failing to instruct the jury on the affirmative defense of consent.
In his second assignment of error, Gilliam claims that the trial court was required to instruct the jury on the "affirmative defense" of consent, as this was the basis of his defense. We agree with the State, however, that consent is not an affirmative defense to a charge of rape, and that no error resulted from the absence of an instruction to the jury on consent.
An "affirmative defense" is defined as "(1) [a] defense expressly designated as affirmative" or (2) [a] defense involving an excuse or justification peculiarly within the knowledge of the accused, on which he can fairly be required to adduce supporting evidence." R.C. § 2901.05(C). As the State points out, the rape statute does not designate consent as an affirmative defense. Thus, if it is an affirmative defense at all, it must fall within the second definition.
The burden of proving an affirmative defense rests with the party asserting the defense. R.C. § 2901.05(A). Were Gilliam's argument successful, the burden of proving consent would rest with the defendant in a rape case, whereas at present the defendant has no such burden. Instead, the burden of showing force or threat of force, which can also be called "nonconsent," is with the State. Placing opposing burdens on the defendant and State to prove consent and nonconsent, respectively, would also be nonsensical since one precludes the other. We have recognized as much in State v. Farler (Aug. 28, 1991), Montgomery App. No. 12377, unreported, where we stated as follows:
 In our estimation, there was no need to include a separate instruction on consent because the instruction, as given, adequately covered the consent "defense" by implication. Farler was not required to prove that Neal [the victim] consented to sexual conduct with him. The State was required to prove that Farler compelled Neal to submit to sexual conduct by force or threat of force. Such proof would have, by definition, negated consent. Absent such proof, Farler was entitled to acquittal. Thus, the court's instruction included the substance of the requested instruction.
Moreover, an affirmative defense is not in the nature of a challenge to the State's evidence on one or more of the elements of the offense charged, as is consent to force or threat of force in the case of rape. In other words, an affirmative defense is one that can coexist with the State's satisfaction of its burden of proving each and every element of an offense beyond a reasonable doubt. The court of appeals in the Eighth District, when presented with an argument claiming "accident" was an affirmative defense to the offense of felonious assault, for which the requisite state of mind is "knowingly," stated the following:
 Accident is not an affirmative defense. Rather, the defense of accident is tantamount to a denial that an unlawful act was committed; it is not a justification for the defendant's admitted conduct. * * * Accident is an argument that supports a conclusion that the state has failed to prove the intent element of the crime beyond a reasonable doubt. (Cites omitted.)
State v. Atterberry (1997), 119 Ohio App.3d 443, 447. The same is true in the present case with regard to consent and the offense of rape.
For the foregoing reasons, we find no error, plain or otherwise, in the trial court's failure to instruct the jury on consent. Accordingly, Gilliam's second assignment of error is overruled.
 III. Mr. Gilliam was denied effective assistance of counsel as guaranteed by the United States and Ohio Constitutions[.]
In his third assignment of error, Gilliam contends he was denied effective assistance of counsel based upon his trial attorney's (1) failure to call J.D. as a witness; (2) failure to request acquittal at the conclusion of the trial; (3) failure to object to jury instructions that did not include an instruction on consent; and (4) admission during closing argument that Gilliam was guilty of possessing cocaine.
Before addressing the merits of Gilliam's assigned error, we note that in reviewing a claim of ineffective assistance of counsel, "[t]rial counsel is entitled to a strong presumption that his or her conduct falls within the wide range of reasonable assistance." State v. Cook (1992), 65 Ohio St.3d 516, 524, citing Strickland v. Washington (1984), 466 U.S. 668, 687-89. The burden is with the appellant to satisfy the two-pronged test employed to determine whether he was accorded effective assistance of counsel at trial. Strickland, supra at 687; State v. Smith (1985), 17 Ohio St.3d 98, 100. First the appellant must show that defense counsel's performance fell below the objective standard of reasonable representation. State v. Bradley (1989), 42 Ohio St.3d 136, paragraph two of the syllabus. Counsel's errors must constitute a "substantial violation of any of defense counsel's essential duties to his client." Id. at 141, quoting State v. Lytle (1976), 48 Ohio St.2d 391, 396-97, vacated in part on other grounds, Lytle v. Ohio (1978), 438 U.S. 910. In addition, the error must be so egregious that the attorney "was not functioning as the `counsel' that the Sixth Amendment guarantees." Cook, supra at 524.
Showing such error does not end the inquiry, however. The second step of the test requires an appellant to prove that there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. Strickland, supra at 694; Bradley, supra, paragraph three of the syllabus. In order to prevail, Gilliam must satisfy both prongs of the foregoing test.
Gilliam's first alleged error by his trial counsel concerns the attorney's failure to call J.D. as a witness for the defense. Ordinarily, a trial attorney's decisions concerning which witnesses to call are considered trial tactics and strategy and do not constitute ineffective assistance. State v. Smith (1996),115 Ohio App.3d 419, 426; State v. Hunt (1984), 20 Ohio App.3d 310,312. Gilliam cites one instance, however, where we have held that a defense attorney's failure to call a witness was unconstitutionally ineffective. State v. McQuerter (May 9, 1997), Montgomery App. No. 15902, unreported. There, the defense attorney called a forensic expert to the stand who was prepared to testify that the murder victim's blood was found on the defendant's companion's shoes and that none was found in the car the defendant and his friend had been driving the night of the murder, facts essential to the case. On the prosecution's objection, the evidence was excluded for lack of a sufficient chain of custody foundation for the articles involved. The defense attorney excused the witness, stating he would recall him after laying the necessary foundation through another witness. Defense counsel, however, never presented that evidence to the jury, nor was the forensic expert ever recalled. We held that the attorney's failure to do so, along with his bumbling cross-examination of a witness, which produced evidence damaging to McQuerter's case and was eventually terminated by the trial court itself, constituted ineffective assistance of counsel.
The present case is distinguishable from McQuerter, however. In the present case, unlike McQuerter, there is nothing in the record from which we could conclude that J.D.'s testimony would have been supportive of Gilliam's version of the events of the evening of June 3, 1998, and the early morning hours of June 4, 1998. It is clear from our opinion in McQuerter that the substance of the forensic expert's testimony was known to all parties and the court, and that there was no disagreement as to what his testimony would be. Such is not the case here. From the record before us, we cannot determine whether J.D.'s testimony would have supported Gilliam's or Weigand's version of the events in the early morning hours of June 4, 1998. Thus, we cannot say that Gilliam's trial attorney's performance was deficient.
Moreover, even supposing J.D.'s testimony would have corroborated Gilliam's story, we would find no prejudice to Gilliam from his attorney's failure to call J.D. as a witness. The fact that a third person may have led another to mistakenly believe a woman would be a willing sexual partner is no excuse for rape, nor does it suggest consent on the woman's part. There is abundant evidence in the record supporting the jury's verdict on the rape count, and we cannot conclude that presentation of J.D.'s testimony, even if it were supportive of Gilliam's side of the story, would have resulted in a different outcome.
Accordingly, we find that Gilliam's trial attorney's decision not to call J.D. as a witness was tactical and did not violate any of the attorney's essential duties to Gilliam. Even if it were otherwise, however, we would find no prejudice to Gilliam that would warrant reversal of his convictions and a new trial.
 The second instance of alleged ineffective assistance of Gilliam's trial counsel concerns the attorney's failure to move for acquittal at the close of the defense's evidence. We note, however, that pursuant to Crim.R. 29(C), Gilliam's defense counsel filed a motion for acquittal on September 9, 1998, which was overruled by the trial court on October 5, 1998. The court noted that the arguments presented in support of the September 9 motion for acquittal were similar to those addressed by the court when it overruled Gilliam's oral motion for acquittal at the close of the State's case in chief, and overruled the second motion for the same reasons it overruled the first. The fact that the motion was presented after the verdict rather than before is of no import; the court's ruling would undoubtedly have been the same regardless. Therefore, we find Gilliam's trial counsel was not deficient in postponing his motion for acquittal until after the verdicts of the jury were returned, and that Gilliam suffered no prejudice therefrom.
We observe, however, that Gilliam's argument on this point might otherwise have been doomed by his statement that "[i]t would only be speculation to discuss how the trial court would have ruled on this motion." Appellant's Brief at 20. Neither this court nor any other that we know of reverses verdicts on speculation. Furthermore, the alleged prejudice suffered by Gilliam as a result of his attorney's purported failure, namely that he was deprived of the opportunity to find out how the judge would have ruled on the motion, is feckless. Were Gilliam correct in stating his attorney failed to move for acquittal at the close of evidence, his unabated curiosity over the matter would have been something for him to come to terms with personally, and would in no way incline this court toward the substantial expenditures of time and money that a new trial would entail.
Next, Gilliam contends his trial counsel's failure to object to jury instructions that did not include an instruction on "consent" constitutes ineffective assistance of counsel. We have already found, supra, however, that an instruction on consent was not necessary since the instructions given adequately covered the consent "defense" by implication. Farler, supra. Gilliam's attorney's failure to make a meritless objection cannot be construed as ineffective assistance of counsel.
Finally, Gilliam claims his trial attorney's closing argument admission that Gilliam was guilty of the cocaine possession count constituted ineffective assistance of counsel. We find this contention to be unconvincing. We quote from Gilliam's testimony on cross-examination the following excerpt:
 Mr. Gilliam, I want to hand you State's Exhibit 17. That is your cocaine, isn't it?
Yes, sir.
That was in your safe, right?
No.
Where was it found? Where did you put it?
It was in my drawer, underneath a towel.
That is yours?
Yes.
 Is that the cocaine — did you give cocaine from that package or from that quantity of cocaine to Shelly [Weigand] that night?
Yes.
Is that where it came from?
Yes
 You supplied her with cocaine how many times, Mr. Gilliam?
One time.
Just once?
Yes.
* * *
 But, you admit that is your cocaine? That is Count Three in the indictment. You admit that is yours, correct?
Yes, sir.
 You are guilty of possession of cocaine in amounts of approximately 12 grams, correct?
I believe so.
 In fact, you plead guilty to that from the stand, don't you, before this jury?
Yes.
Without any further analysis, we can conclude that Gilliam was in no way prejudiced by his trial counsel's accurate statement that Gilliam "hung himself" on the cocaine possession count. Since Gilliam can show no prejudice, his attorney's performance cannot constitute ineffective assistance of counsel.
For the foregoing reasons, we find Gilliam's arguments that he was denied the effective assistance of counsel to be without merit. Accordingly, his third assignment of error is overruled.
 IV. Mr. Gilliam's conviction was against the manifest weight of the evidence as well as unsupported by the sufficiency of the evidence.
In his fourth and final assignment of error, Gilliam claims his conviction was both unsupported by sufficient evidence and against the manifest weight of the evidence.
As for his argument that his conviction was unsupported by sufficient evidence, we note again that the test an appellate court must apply when reviewing a challenge based on the sufficiency of the evidence to support a conviction is the same as in reviewing a challenge based upon a denial of a motion for acquittal. See Thompson, supra. In Gilliam's first assignment of error above, we concluded that the trial court did not err in denying Gilliam's motion for acquittal because there was sufficient evidence from which a reasonable person could conclude that the State had proved beyond a reasonable doubt each and every element of the three offenses with which Gilliam was charged. Since the test used in Gilliam's first assignment of error is identical to the one applicable here, we reach the same conclusion for the reasons previously stated. Consequently, we find the jury's verdicts on all counts were supported by sufficient evidence.
As for Gilliam's contention that his convictions are against the manifest weight of the evidence, we note that the totality of his argument on that point is contained in a portion of his brief that exceeds the maximum page limit for briefs in this district, and that he made no motion for an enlargement of the page limitation. App. R. 19(A); Loc.R. 2.2(A). Nevertheless, because the argument is easily disposed of, and in the interest of fairness, we will address it as if it conformed to the local rules.
Gilliam's argument rests entirely on a distinction between reviewing convictions under a sufficiency of the evidence standard and a manifest weight of the evidence standard. Specifically, he correctly claims that under the latter standard, the reviewing court is not required to view the evidence in a light most favorable to the prosecution and it may consider the credibility of the witnesses. See State v. Thompkins (1997), 78 Ohio St.3d 380,387. This being so, Gilliam urges us to consider again his argument that it is impossible that Weigand tried to escape, was dragged back into the apartment and raped, got away, and hid under Tate's shrub in the three-minute time span between Weigand's phone call to her apartment from his and Tate's discovery of her cowering under the shrub.
After a thorough review of the record, however, we find that the distinction between the standards employed in sufficiency of the evidence claims and manifest weight of the evidence arguments is not enough to persuade us that "the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." Thompkins, supra, citing State v. Martin (1983), 20 Ohio App.3d 172, 175. Thus, Gilliam's argument that his convictions were against the manifest weight of the evidence is unavailing.
Gilliam's fourth assignment of error is overruled.
Having found no merit to any of Gilliam's assigned errors, his convictions are affirmed.
GRADY, P.J. and WOLFF, J., concur.
Copies mailed to:
Andrew T. French
L. Patrick Mulligan
Hon. John W. Kessler