[Cite as *State v. Adkins*, 2011-Ohio-5360.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
SCIOTO COUNTY

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| | : | |
| Plaintiff-Appellee, | : | Case No. 10CA3367 |
| | : | |
| vs. | : | **Released: September 30, 2011** |
| | : | |
| CHRISTOPHER ADKINS, | : | DECISION AND JUDGMENT |
| | : | ENTRY |
| Defendant-Appellant. | : | |

APPEARANCES:

Gene Meadows, Portsmouth, Ohio, for Appellant.

Mark E. Kuhn, Scioto County Prosecutor, and Julie Cooke Hutchinson, Scioto County Assistant Prosecutor, Portsmouth, Ohio, for Appellee.

McFarland, J.:

{¶1} Appellant Christopher Adkins appeals his conviction in the Scioto County Court of Common Pleas after a jury found him guilty of rape, a felony of the first degree in violation of R.C. 2907.02(A)(2); kidnapping, a felony of the first degree in violation of R.C 2905.01(A)(4); and felonious assault, a felony of the second degree in violation of R.C. 2903.11(A)(1)/(D)(1)(a). The trial court found Appellant guilty of sexually violent predator specifications and repeat violent offender specifications. On appeal, Appellant raises two assignments of error, arguing that 1) the trial court erred by failing to suppress Appellant's statements, as

they were obtained in violation of his right to remain silent and right to counsel; and 2) the trial court erred by failing to suppress Appellant's statements, as they were coerced and involuntary. Having reviewed the record, we find that the trial court did not err in denying Appellant's motion to suppress and we overrule Appellant's two assignments of error. We affirm the judgment of the trial court.

FACTS

{¶2} During the evening hours of August 25, 2009 and the early morning hours of the following day, Appellant was camping in Scioto County, Ohio. While there, Appellant met Shirese Sissel ("Sissel"), the victim, and the two began conversing. Sissel and her friends were consuming alcohol and carousing. At some point, Sissel prepared to leave and went to her vehicle. Appellant disputes what happened after that. Law enforcement indicated that Sissel stated Appellant had raped her, after which she got into her vehicle and immediately drove to get help.

{¶3} Acting upon Sissel's allegation that Appellant had raped her, law enforcement went to the campground and retrieved Appellant. They transported Appellant to the Scioto County Sheriff's Office and placed him in an interview room.

{¶4} Detective Jodi Conkel of the Scioto County Sheriff's Office began interviewing Appellant about Sissel's allegation. The interview was recorded with

both audio and video. Detective Conkel read Appellant his *Miranda* warnings. Even though Appellant stated that he knew his rights, Detective Conkel advised him that she had to read them to him regardless. After Detective Conkel finished reading Appellant his rights, he indicated that he understood them. Detective Conkel did not obtain a written waiver of Appellant's rights.

{¶5} Moments after the interview began, Captain David Hall of the Scioto County Sheriff's Office notified Detective Conkel that the recording equipment had malfunctioned and the interview up to that point had not been recorded properly. Captain Hall reset the recording equipment and the interview resumed with Detective Conkel informing Appellant that she had spoken with his parole officer, informed him that she had advised Appellant of his rights, and was interviewing him. Appellant did not dispute Detective Conkel's recitation.

{¶6} As we discuss below, Appellant mentioned wanting to speak to an attorney several times during the interrogation. He also noted a desire not to speak with law enforcement on several occasions. Conversely, Appellant then contradicted these statements by continuing to speak to Detective Conkel and Captain Hall.

{¶7} Throughout the interrogation, Detective Conkel had made several promises to Appellant. She had promised that because Appellant believed someone had spiked the snuff he had used the previous night, she would

investigate. (Tr. at 72-74.) She had promised that she would personally call his doctor to get him his proper medication. (Tr. at 76.) She had promised to determine if Appellant had been drugged. (Tr. at 77.) She had also promised to check on Appellant while he was incarcerated. At the suppression hearing, it was determined that Detective Conkel had not upheld any of those promises.

{¶8} Detective Conkel has also assured Appellant that if he was honest, the process would be easier for him. "I'm just telling you that it's going to be ten times easier on you if you're honest and be a man * * *." (Tr. at 85.) She reiterated to Appellant, "[I]f you're honest and you stand up and say hey, you know, I'm a man and I made a mistake * * * I will vouch for that[,] then one[,] you're going to have me backing you 100 percent because I'm going to say, you know what, he was honest, he cooperated, he needs help." (Tr. at 86.) When Appellant stated his concern of returning to prison if he admitted to raping Sissel, Detective Conkel explicitly stated that she could not promise Appellant anything regarding his sentence, but it would still be easier if she was on his side telling everyone he had been honest. (Tr. at 86-87.)

{¶9} Detective Conkel continued interrogating Appellant about what had occurred earlier that morning. Appellant eventually admitted that he had approached Sissel when she went to her car and he had grabbed her. Appellant then removed Sissel's clothing, laid her on the ground, and proceeded to have

intercourse with her.  Appellant abruptly stopped due to "[t]he conscience" and

"[p]rison."  (Tr. at 100.)  Appellant had been to prison before for rape.  Overall, the

interrogation had lasted nearly four hours.

{¶10} Appellant moved to suppress the statements he made to Detective

Conkel and Captain Hall, which the trial court denied.  With the video of the

interrogation admitted at trial, as well as the testimony of several witnesses, the

jury convicted Appellant of rape, kidnapping, and felonious assault.  Appellant had

waived his right to trial by jury on the sexually violent predator and repeat violent

offender specifications, which were tried to the court.  The trial court found

Appellant guilty of those specifications, too.

## ASSIGNMENTS OF ERROR

"I. THE TRIAL COURT ERRED TO THE PREJUDICE OF DEFENDANT
WHEN THE TRIAL COURT FAILED TO GRANT DEFENDANT-
APPELLANT'S MOTION TO SUPPRESS AND ALLOWING THE
CONFESSION OF DEFENDANT-APPELLANT TO BE USED AGAINST
THE DEFENDANT-APPELLANT WHEN THE CONFESSION WAS
OBTAINED IN VIOLATION OF THE DEFENDANT-APPELLANT'S
CONSTITUTIONAL RIGHTS TO COUNSEL AND TO REMAIN
SILENT.

"II. THE TRIAL COURT ERRED TO THE PREJUDICE OF
DEFENDANT-APPELLANT BY FAILING TO SUPPRESS THE
STATEMENT THAT WAS INVOLUNTARY AND OTBAINED IN
VIOLATION OF THE DEFENDANT-APPELLANT[']S
CONSTITUTIONAL RIGHTS AS A RESULT OF PROMISES MADE BY
THE INTERROGATING OFFICER RESULTING IN COERCION OF
THE DEFENDANT-APPELLANT."

STANDARD OF REVIEW

{¶11} "Appellate review of a motion to suppress presents a mixed question of law and fact.  When considering a motion to suppress, the trial court assumes the role of trier of fact and is therefore in the best position to resolve factual questions and evaluate the credibility of witnesses."  *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, at ¶8, citing *State v. Mills* (1992), 62 Ohio St.3d 357, 366, 582 N.E.2d 972.  "Consequently, an appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence."  Id., citing *State v. Fanning* (1982), 1 Ohio St.3d 19, 437 N.E.2d 583.  "Accepting these facts as true, the appellate court must then independently determine, without deference to the conclusion of the trial court, whether the facts satisfy the applicable legal standard."  Id., citing *State v. McNamara* (1997), 124 Ohio App.3d 706, 707 N.E.2d 539.  See, also, *State v. Roberts*, 110 Ohio St.3d 71, 2006-Ohio-3665, 850 N.E.2d 1168, at ¶100.

{¶12} Preliminarily, "[w]here factual issues are involved in determining a motion, the court shall state its essential findings on the record."  Crim.R. 12(F).  In the case sub judice, the trial court made no explicit findings of fact when it denied Appellant's motion to suppress.  However, "[t]he extensive record of the suppression hearing is 'sufficient to allow full review of the suppression issues.'"  *State v. Sapp*, 105 Ohio St.3d 104, 822 N.E.2d 1239, 2004-Ohio-7008, at ¶96,

quoting *State v. Waddy* (1992), 63 Ohio St.3d 424, 443, 588 N.E.2d 819; citing *State v. Brewer* (1990), 48 Ohio St.3d 50, 60, 549 N.E.2d 491.

ASSIGNMENT OF ERROR I

{¶13} In his first assignment of error, Appellant contends that the trial court erred by not suppressing his statements made during the interrogation because law enforcement violated his right to remain silent and his right to counsel. Appellant argues that there is no evidence he was given his *Miranda* warnings, nor is there evidence that he waived his rights. Furthermore, Appellant asserts that he invoked his right to remain silent and right to counsel, which law enforcement ignored by continuing to interrogate him. We disagree.

{¶14} Prior to initiating a custodial interrogation, law enforcement must "inform an accused 'that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.'" *State v. Ulery*, Athens App. No. 07CA28, 2008-Ohio-2452, at ¶7, quoting *Miranda v. Arizona* (1966), 384 U.S. 436, 479, 86 S.Ct. 1602, 16 L.Ed.2d 694. Neither party in this case argues that Appellant was not subject to a custodial interrogation or that there was no need to have given him the *Miranda* warnings.

{¶15} To use a statement made by the accused during a custodial interrogation, the prosecution must show: "(1) the accused, prior to any interrogation, was given the *Miranda* warnings; (2) at the receipt of the warnings, or thereafter, the accused made 'an express statement' that he desired to waive his *Miranda* constitutional rights; (3) the accused effected a voluntary, knowing, and intelligent waiver of those rights." *State v. Edwards* (1976), 49 Ohio St.2d 31, 38, 358 N.E.2d 1051 (overruled on other grounds), citing *Miranda*. However, contrary to the second prong in *Edwards*, the Supreme Court recently held that the prosecution "does not need to show that a waiver of *Miranda* rights was express. An 'implicit waiver' of the 'right to remain silent' is sufficient to admit a suspect's statement into evidence." (Citation omitted.) *Berghuis v. Thompkins* (2010), __ U.S. __, 130 S.Ct. 2250, 2261, 176 L.Ed.2d 1098. "Where the prosecution shows that a *Miranda* warning was given and that it was understood by the accused, an accused's uncoerced statement establishes an implied waiver of the right to remain silent." Id. at 2262. That is because "the law can presume that an individual who, with a full understanding of his or her rights, acts in a manner inconsistent with their exercise has made a deliberate choice to relinquish the protection those rights afford." Id.

{¶16} To begin, it is clear from the record in this case that Detective Conkel advised Appellant of his *Miranda* rights. Detective Conkel testified that she had

read Appellant his rights prior to the start of the recorded portion of the interrogation. Her notes reflected the same. Captain Hall, who had been watching the interrogation in an observation room, corroborated that Detective Conkel had indeed advised Appellant of his *Miranda* rights. This evidence was uncontroverted. Thus, the record establishes that Detective Conkel advised Appellant of his *Miranda* rights before interrogating him.

{¶17} Addressing whether Appellant had waived his *Miranda* rights, we hold that Appellant implicitly waived his rights when he began speaking to Detective Conkel. Detective Conkel had clearly advised Appellant of his rights. While Appellant did not execute a written waiver of his rights, he spoke to Detective Conkel of his own free will. Under *Thompkins*, because Appellant was aware of his rights, and his decision to speak to Detective Conkel was inconsistent with the exercise of those rights, Appellant implicitly waived his rights when he began speaking. Thus, the record establishes that Appellant initially waived his right to remain silent and his right to counsel.

{¶18} The next inquiry is whether Appellant invoked his right to counsel after his initial waiver. Appellant was free to invoke his rights after initially waiving them, as an "interrogation provides a suspect with additional information that can put his or her decision to waive, or not to invoke, into perspective."

*Thompkins* at 2264. Yet even if Appellant later invoked his rights, he can subsequently waive them and reinitiate the interrogation with law enforcement.

{¶19} When dealing with a claim that law enforcement continued to interrogate the accused after he invoked his right to counsel, "[f]irst, [we] must determine whether the accused actually invoked his right to counsel." *Smith v. Illinois* (1984), 469 U.S. 91, 95, 105 S.Ct. 490, 83 L.Ed.2d 48. "It is fundamental that once a suspect invokes his right to counsel, all interrogation must cease." *State v. Colquitt*, 188 Ohio App.3d 509, 2010-Ohio-2210, 936 N.E.2d 76, at ¶12, citing *State v. Turvey* (1992), 84 Ohio App.3d 724, 732, 618 N.E.2d 214; *State v. Jobe*, 6th Dist. No. L-07-1413, 2009-Ohio-4066, at ¶ 67. "Invocation of the *Miranda* right to counsel 'requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney.'" *Davis v. United States* (1994), 512 U.S. 452, 459, 114 S.Ct. 2350, 129 L.Ed.2d 362, quoting *McNeil v. Wisconsin* (1991), 501 U.S. 171, 178, 111 S.Ct. 2204, 115 L.Ed.2d 158. "But if a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel, [the Court's] precedents do not require the cessation of questioning." (Emphasis in original.) Id. "Rather, the suspect must unambiguously request counsel." Id. As the Supreme Court observed, "'a statement either is such an

assertion of the right to counsel or it is not.'" Id., quoting *Smith v. Illinois* (1984), 469 U.S. 91, 97-98, 105 S.Ct. 490, 83 L.Ed.2d 48.

{¶20} Second, if we find that the accused did invoke his right to counsel, we "may admit his responses to further questioning only on finding that he (a) initiated further discussions with the police, and (b) knowingly and intelligently waived the right he had invoked." Id., citing *Edwards v. Arizona* (1981), 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378. "[A]n accused * * * having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." *Edwards*, 451 U.S. at 484-485. See, also, *State v. Van Hook* (1988), 39 Ohio St.3d 256, 530 N.E.2d 883. "[I]nquiries or statements, by either an accused or a police officer, relating to routine incidents of the custodial relationship, will not generally 'initiate' a conversation in the sense in which that word was used in *Edwards* [*v. Arizona*]." *Oregon v. Bradshaw* (1983), 462 U.S. 1039, 1045, 103 S.Ct. 2830, 77 L.Ed.2d 405. Though the Supreme Court declined to fully define the term "initiate," it did note that "a willingness and a desire for a generalized discussion about the investigation * * * not merely a necessary inquiry arising out of the incidents of the custodial relationship" was sufficient to show initiation. *Bradshaw* at 1045-1046. Because the analysis of whether Appellant invoked his

rights is factually dependant, we will address each of his possible invocations separately.

First Possible Invocation

{¶21} Detective Conkel was interrogating Appellant about the events of that morning. Appellant denied any wrongdoing and Detective Conkel asked him to submit to a computer voice stress analysis ("CVSA"). Appellant was willing to turn over his clothing, but was apprehensive about submitting to the CVSA:

{¶22} "DEFENDANT:   Like I said, I will give you guys my clothes, if that's what you want. But on something like that [referring to the CVSA], I would like to ask an attorney.

"DETECTIVE CONKEL:       I mean that's – that's your right.

"DEFENDANT:   You know, because I don't really know the law that well.

"DETECTIVE CONKEL:       Right.

"DEFENDANT:   You know, I'm not saying I'm guilty, I'm not saying – I'm definitely saying I'm not guilty, but you know, I've never – it's just too much."
(Tr. at 25.)

{¶23} Detective Conkel then explained the accuracy and purpose of the CVSA. Appellant responded to Detective Conkel's explanation by inquiring about whether Sissel's DNA would be present on his clothing. Detective Conkel

answered Appellant's questions and he eventually agreed to take the CVSA. "If you guys want it, I'll give it to you." (Tr. at 27.)

{¶24} When Detective Conkel was asking Appellant to submit to the CVSA, he clearly invoked his right to counsel when he stated he "would like to ask an attorney" before agreeing to submit to the CVSA. "I would like to ask an attorney," is not ambiguous, it is not equivocal, and it is not open to multiple interpretations.

{¶25} After, the invocation though, Appellant's discussion about his guilt or innocence in the pending investigation reinitiated the interrogation. His statement was not pertinent to the custodial relationship, but rather expressed Appellant's willingness to continue discussing the pending investigation. Additionally, Detective Conkel had honored Appellant's request to speak to counsel and ceased questioning him about the investigation. When she reiterated the function and purpose of the CVSA to Appellant, she was not continuing the interrogation. Appellant's question about whether the victim's DNA would be present on his clothing reaffirmed his willingness and desire to discuss the pending investigation, waiving his invocation of his rights. Thus, the interrogation was free to continue.

Second Possible Invocation

{¶26} Captain Hall then prepared to conduct the CVSA. At Appellant's request, Captain Hall read aloud the waiver that Appellant was to sign, indicating

his willingness to take the CVSA and that he was doing so of his own free will.

Appellant and Captain Hall both signed the form.  After Captain Hall administered

the CVSA, he had another person interpret the results.  Captain Hall relayed to

Appellant that the results indicated he had been deceitful on his answer denying

that he had penetrated Sissel.  Appellant refuted the results and Captain Hall

responded that he was done talking to Appellant and he was taking him to lockup.

After additional dialogue between Captain Hall and Appellant, Appellant asked:

"DEFENDANT:    Can I see a lawyer?

"CAPTAIN HALL:   Yeah.

"DEFENDANT:   Please.

"CAPTAIN HALL:   Because you're going to need one.  You decide you

want to talk to me without lying, you let me know.

"DEFENDANT:   Honestly sir, I'm not lying to you.  I mean, I'm telling

you everything."

(Tr. at 62.)

{¶27} Here, Appellant again made a clear and unambiguous invocation of

his right to counsel when he asked, "Can I see a lawyer?"  Captain Hall assured

Appellant that he would be provided with an attorney.  Yet immediately thereafter,

Appellant reinitiated the interrogation by discussing whether he had been forthright

with Captain Hall.  Appellant's statement was not incidental to the custodial

relationship, but again expressed "a willingness and a desire for a generalized discussion about the investigation." Thus, Appellant had reinitiated the interrogation and questioning was free to continue.

Third Possible Invocation

{¶28} Appellant continued to profess his innocence to Captain Hall and then made a phone call to his mother. Captain Hall asked for Appellant to turn off his phone, as he was going to be booked into the jail. Appellant began to steer the conversation back to the facts of the investigation and Captain Hall again asked Appellant if he wished to talk to him without an attorney present:

"CAPTAIN HALL: Do you want to talk to me without an attorney, because you asked for an attorney?

"DEFENDANT: No, I'd rather have one.

"CAPTAIN HALL: Okay. Well, I can't talk to you then."

(Tr. at 64.)

{¶29} As Captain Hall acknowledged, Appellant had clearly invoked his right to counsel and right to remain silent regarding the investigation. In response to Captain Hall's question, appellant unequivocally stated that he did not wish to continue speaking to Captain Hall about the investigation without an attorney present.

{¶30} Appellant then asked Captain Hall about what items he wanted him to remove from his person prior to booking. These questions were germane to the custodial relationship and did not reinitiate the interrogation. Appellant also told Captain Hall that he had "better put [him] on suicide watch," but Captain Hall explained that Appellant could bond out of jail. (Tr. at 65.) None of this constituted a continuation of the interrogation by Captain Hall nor a reinitiation by Appellant.

{¶31} However, Appellant then began reiterating his innocence to Captain Hall. "I'm telling you, I'm telling you, I didn't do nothing, I swear." (Tr. at 65.) Rather than remain silent about the investigation, Appellant wanted to restate his innocence. Appellant's discussion of his innocence related to the investigation, again extinguishing his invocation of his rights, and again reinitiated the interrogation.

Fourth Possible Invocation

{¶32} Because Appellant had again steered the discussion back to the investigation, Captain Hall asked Appellant a second time if he wished to continue talking to him about the investigation, or if he wished to wait until an attorney was present:

"CAPTAIN HALL:          I can't sit here and talk to you because you told me you wanted an attorney.  If you want to tell me – if you want to talk to me without one, I'll stand here and talk to you.  You want me to stand here and talk to you?

"DEFENDANT:    No."

(Tr. at 65-66.)  Captain Hall then asked Appellant whether he had any other items on his person, continuing the pre-booking search.  Detective Conkel then reentered the room and informed Appellant that his parole officer would be holding him in jail until the investigation was complete.  She then asked Appellant:

"DETECTIVE CONKEL:          You've had a long night.  I know – I think Tom's going to hold you for a couple of days until this investigation is completed.  You parole officer, he has the right to do that.  Is there any questions you have for me or anything or –

"DEFENDANT:    Did she fight back?

"DETECTIVE CONKEL:    – do – I know Dave said something about you wanting an attorney; do you still want to talk to me, because I mean –

"DEFENDANT:    I just want to ask that question.

"DETECTIVE CONKEL:    – okay.

"DEFENDANT:    If I can."

(Tr. at 66.)

{¶33} Appellant's response to Captain Hall's question about whether he wished to speak to him again re-invoked his rights. It was clear that Appellant did not want to speak to Hall without an attorney. Yet it is clear that Detective Conkel was not continuing the interrogation of Appellant, but was instead beginning to ask Appellant whether he had any questions regarding his parole officer holding him in jail.

{¶34} Yet before Detective Conkel could even complete her question, Appellant interrupted her to ask about the investigation: whether the victim had fought back. This reinitiated the interrogation. Even as Detective Conkel was attempting to insure that Appellant did not want to stop speaking and consult an attorney, Appellant interrupted her a second time to get her to answer his question about whether Sissel had fought back. Clearly, Appellant was willing to discuss the investigation. Thus, Appellant had reinitiated the interrogation and questioning could continue.

Fifth Possible Invocation

{¶35} After Appellant had interrupted Detective Conkel, she answered Appellant's questions and in turn, posed her own questions to him. After a significant dialogue, Appellant again mentioned a lawyer:

"DEFENDANT:   I know. I asked for a lawyer a while ago, but I don't even know where they're at.

"DETECTIVE CONKEL:        I mean if you don't want to talk to me, if you want a lawyer, I'll stop talking to you.  I mean, it don't matter to me.

"DEFENDANT:    It's not that, it's not.

"DETECTIVE CONKEL:        It's your choice, honey.  Either –

"DEFENDANT:    I know.

"DETECTIVE CONKEL:        – you want to talk to me or you don't.  It doesn't matter to me.

"DEFENDANT:    I know, it's just, I'm trying to think.  I can't, you know, I don't know what to do."

(Tr. at 81-82.)

{¶36} Here, Appellant did not clearly invoke his right to counsel.  While Appellant referenced a previous invocation of his rights, which he later waived by reinitiating the interrogation, his reference was not a clear invocation of his right to counsel at that time.  Appellant's own words show his ambiguity: when told it was his choice whether to stop the interrogation and speak with an attorney, his ultimate answer was "I don't know what to do."  As the Supreme Court noted, a statement is either an unambiguous request for an attorney or it is not; Appellant's statement here was ambiguous.  Once again, the interrogation was free to continue.

Sixth Possible Invocation

**{¶37}** As Appellant continued talking to Detective Conkel and worked through his confusion, Detective Conkel again offered Appellant the opportunity to request to speak with an attorney:

"DEFENDANT:   I don't know what to do.

"DETECTIVE CONKEL:        – I mean, that's up to you.  If you want a lawyer, I'll stop right now and you can make calls to get a lawyer and I will just go ahead and take you over and book you in.  That's your right, honey.

"DEFENDANT:   If I do say this, that I do, what happens?  I go and get booked in –

"DETECTIVE CONKEL:        You're going to be booked in regardless.  Okay?  Whether you say it or not –

"DEFENDANT:    – because Tom [Appellant's parole officer] wants me on a holder.

"DETECTIVE CONKEL:        That is correct.  Okay?  So the only difference is, and is it okay to talk to you because you said –

"DEFENDANT:   Yes.  Yeah, go ahead."

(Tr. at 87-88.)

**{¶38}** Again, Appellant did not clearly invoke his right to counsel. Appellant reiterated that he did not know what to do and Detective Conkel clarified

that Appellant would be booked in to the jail regardless. Appellant then expressly waived his right to counsel and right to remain silent and indicated that Detective Conkel could continue speaking with him about the investigation. Thus, it was again proper for the interrogation to continue.

{¶39} Throughout the interrogation, Appellant vacillated between invoking and relinquishing his rights several times, with the net result being that Appellant ultimately waived his rights and submitted to the interrogation by Detective Conkel and Captain Hall. The record is also clear that law enforcement officers were respectful of Appellant's rights and took care to understand whether Appellant was invoking or relinquishing his rights.

{¶40} As in *Thompkins*, Appellant understood his rights. Appellant knew his rights well enough that he had asked Detective Conkel to forego reading them. Furthermore, the fact that Appellant had invoked his rights numerous times also indicates that he "knew what he gave up when he spoke." *Thompkins* at 2262. This leads to the conclusion that Appellant knowingly and intelligently waived his rights when he spoke with law enforcement. Thus, the trial court was correct to deny this portion of Appellant's motion to suppress, and we overrule Appellant's first assignment of error.

ASSIGNMENT OF ERROR II

**{¶41}** In his second assignment of error, Appellant contends that the trial court erred by not suppressing his statements made during the interrogation because law enforcement coerced him and his waiver of his rights and incriminating statements were involuntary. Appellant argues that Detective Conkel's multiple promises, deception, and alleged promise of a lenient sentence, combined to coerce him into waiving his rights and making incriminating statements. Because we find no promise of leniency, and the evidence does not demonstrate that Detective Conkel's deceptive promises were coercive, we cannot say, given the totality of the circumstances, that law enforcement was coercive or overbore Appellant's will. Thus, we overrule Appellant's second assignment of error.

**{¶42}** "[E]ven if *Miranda* warnings were required and given, a defendant's statements may be made involuntarily and, thus, be subject to exclusion." *State v. Marshall*, Lawrence App. No. 06CA23, 2007-Ohio-6298, at ¶24, citing *State v. Kelly*, 2nd Dist. No.2004-CA-20, 2005-Ohio-305, at ¶ 11. "'A suspect's decision to waive his Fifth Amendment privilege is made voluntarily absent evidence that his will was overborne and his capacity for self-determination was critically impaired because of coercive police conduct.'" Id. at ¶25, quoting *State v. Dailey* (1990), 53 Ohio St.3d 88, 91, 559 N.E.2d 459. "'In determining whether a

suspect's statement was made voluntarily, a court should consider the totality of the circumstances. These circumstances include "the age, mentality, and prior criminal experience of the accused; the length, intensity, and frequency of interrogation; the existence of physical deprivation or mistreatment; and the existence of threat or inducement."'" Id., quoting *State v. Sneed,* 166 Ohio App.3d 492, 2006-Ohio-1749, 851 N.E.2d 532, at ¶31, quoting *State v. Edwards* (1976), 49 Ohio St.2d 31, 3 O.O.3d 18, 358 N.E.2d 1051.

{¶43} "[D]eception is 'a factor bearing on voluntariness. * * *' However, this factor, standing alone, is not dispositive of the issue." *State v. Wiles* (1991), 59 Ohio St.3d 71, 81, 571 N.E.2d 97, quoting *Schmidt v. Hewitt* (C.A.3, 1978), 573 F.2d 794, 801. See, also, *State v. Burke* (1995), 73 Ohio St.3d 399, 406, 653 N.E.2d 242; *State v. Cooey* (1989), 46 Ohio St.3d 20, 26-27, 544 N.E.2d 895 (superseded on other grounds). Likewise, "'[u]nder the "totality of circumstances" standard, the presence of promises does not as a matter of law, render a confession involuntary.'" *State v. Humphrey*, Ross App. No. 10CA3150, 2010-Ohio-5950, at ¶17, quoting *Edwards,* 49 Ohio St.2d at 41. Regarding both deception and inducement, "'[t]o support a determination that a confession was coerced, the evidence must establish that: (1) the police activity was objectively coercive; (2) the coercion in question was sufficient to overbear defendant's will; and (3)

defendant's will was, in fact, overborne as a result of the coercive police activity.'"

Id. at ¶18, quoting *United States v. Rigsby* (C.A.6, 1991), 943 F.2d 631, 635.

{¶44}Here, Appellant was 36 years old. There was no evidence that his mentality was anything but normal; there was no evidence that he was of below average intelligence or suffered from a disability. Regarding Appellant's prior criminal experience, he had been convicted of rape before and spent eight years in prison. He was presumably familiar with the criminal justice system, which was corroborated by his indication that Detective Conkel could skip the *Miranda* warnings because he already knew them.

{¶45} As for the interrogation, it was not intense because there were no raised voices or shouting, there was no banging of fists on the table, and there was no indication that either Detective Conkel or Captain Hall maintained a close proximity to Appellant in order to intimidate him. The frequency of the interrogation was, however, fairly constant. On the other hand, there was no evidence that anyone mistreated Appellant or subjected him to physical deprivation. Similarly, no one had threatened Appellant.

{¶46} Regarding inducement, Appellant maintains that Detective Conkel's statement that it would be easier on him if he was honest was "the most egregious" deception and was an implied promise of leniency. We disagree.

{¶47} First, the statement was not an implied promise of leniency. Detective Conkel continually stated that she had no control over Appellant's sentence. Her explicit denial that she could affect Appellant's sentence contradicts any possible inference that her statement was a promise of leniency.

{¶48} Second, reminding Appellant of the consequences that would flow naturally from telling the truth was not a promise of leniency, but rather an admonition to tell the truth. "[A]n admonition to tell the truth" is neither a promise nor a threat, and is completely permissible during an interrogation. *State v. Cooey* (1989), 46 Ohio St.3d 20, 28, 544 N.E.2d 895 (superseded on other grounds). See, also, *State v. Wiles* (1991), 59 Ohio St.3d 71, 80-81, 571 N.E.2d 97 (following *Cooey* and holding that "admonitions to tell the truth directed at a suspect by police officers are not coercive in nature."). Accordingly, Appellant's chief concern about "deception" is without merit.

{¶49} In the same context, while Detective Conkel did make promises to Appellant, which were ultimately unfulfilled, we cannot say that these promises induced Appellant to waive his rights or were coercive. Promises are not per se coercive. Nor is deception per se coercive. There was also no indication that Detective Conkel's "deceptive promises" factored into Appellant's decision to waive his rights and speak to Detective Conkel. Thus, we cannot say that Detective Conkel's statements were coercive.

{¶50} Given that none of Detective Conkel's conduct was coercive, Appellant cannot show that there was coercion "sufficient to overbear [his] will" or that his "will was, in fact, overborne as a result of the coercive police activity," under *Humphrey*. Considering the totality of the circumstances, we cannot say that law enforcement engaged in coercive activity that overbore Appellant's will and rendered his waiver of rights involuntary, and the trial court was correct in denying Appellant's motion to suppress. Therefore, we overrule Appellant's second assignment of error and affirm the trial court's denial of his motion to suppress.

**JUDGMENT AFFIRMED**.

## **JUDGMENT ENTRY**

It is ordered that the JUDGMENT BE AFFIRMED and that the Appellee recover of Appellant costs herein taxed.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Scioto County Common Pleas Court to carry this judgment into execution.

IF A STAY OF EXECUTION OF SENTENCE AND RELEASE UPON BAIL HAS BEEN PREVIOUSLY GRANTED BY THE TRIAL COURT OR THIS COURT, it is temporarily continued for a period not to exceed sixty days upon the bail previously posted. The purpose of a continued stay is to allow Appellant to file with the Supreme Court of Ohio an application for a stay during the pendency of proceedings in that court. If a stay is continued by this entry, it will terminate at the earlier of the expiration of the sixty day period, or the failure of the Appellant to file a notice of appeal with the Supreme Court of Ohio in the forty-five day appeal period pursuant to Rule II, Sec. 2 of the Rules of Practice of the Supreme Court of Ohio. Additionally, if the Supreme Court of Ohio dismisses the appeal prior to expiration of sixty days, the stay will terminate as of the date of such dismissal.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
Exceptions.

Harsha, P.J. and Kline, J: Concur in Judgment and Opinion.

For the Court,

BY:  _____
Matthew W. McFarland, Judge

**NOTICE TO COUNSEL**
**Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.**